65 So.2d 886

**NOEL ESTATE, Inc. v. MURRAY et al.**

No. 40311.

June 1, 1953.

Bullock & Bullock, Shreveport, for plaintiff-appellee.

Donald C. Dickson, Shreveport, for appellants.

HAMITER, Justice.

On October 11, 1934, Noel Estate, Inc., executed an oil, gas and mineral lease in favor of Mrs. Ethel Mae Murray, wife of T. W. Murray, covering and affecting a 60 acre tract of land located in Lot 2, Section 15, Township 20 North, Range 15 West, Caddo Parish. The lease was for a term of three years (called primary term) and as long thereafter as production was had from the land. It further recited that the rights of either party thereunder could be assigned in whole or in part.

Within the primary term the lessee, together with her husband, completed an oil well on the north 10 acres of the tract, and it has since continually produced. No production was ever obtained on the remaining or south 50 acres.

On January 23, 1940 the named lessee, joined by her husband, transferred the described lease as to the producing north 10 acres to one R. C. Smith.

Some ten years later Noel Estate, Inc., the lessor, instituted this suit against Mrs. Murray, her husband, and R. C. Smith seeking a judgment declaring the original 60 acre lease terminated in its entirety and ordering it cancelled from the records of Caddo Parish. In the petition plaintiff alleged that "Said lease has terminated because the term thereof has expired, the ten acre tract having ceased to produce oil in paying quantities, and the remaining tract of 50 acres never having been developed."

Defendants, in their answers, denied that the lease had expired, they affirmatively averring that oil is still being produced thereunder in paying quantities. They prayed for a rejection of plaintiff's demands.

On October 31, 1950, during the pendency of this suit, the Murrays purportedly transferred the lease as to the south 50 acres to R. C. Smith.

The district court, after trial, ordered the cancellation of the lease insofar as it affected the south 50 acres of land and decreed it to be in full force and effect as to the north 10 acres on which the producing well existed.

From the judgment the defendants appealed. Plaintiff answered, praying that the lease be ordered cancelled as to the north 10 acres also.

By an express contractural provision Mrs. Murray, the lessee, possessed authority to assign her rights under the lease in whole or in part. That authority was exercised when, on January 23, 1940, she transferred to R. C. Smith the lease as to the north 10 acres, the transfer having been in fact and in law an assignment (as distinguished from a sublease) for no interest was reserved by the transferor and the transferee was vested with complete and unqualified control. She, as the result of her action and as she had the right to do, divided a divisible lease, creating in favor of Smith an independent lease on the north 10 acres. But, as a further consequence, the lease as to the remaining 50 acres thereafter expired under its own provisions, the primary term of three years having long since elapsed and no production on that part of the tract having ever been obtained. According to the settled jurisprudence of this court production from the newly created and independent 10 acre lease could not and did not serve to continue in force and effect the lease as to the remaining 50 acres. Smith v. Sun Oil Company, Inc., 165 La. 907, 116 So. 379, Swope v. Holmes, 169 La. 17, 124 So. 131, Roberson v. Pioneer Gas Company, 173 La. 313, 137 So. 46, 82 A.L.R. 1264, Bond v. Midstates Oil Corporation, 219 La. 415,

53 So.2d 149. Cancellation of the lease as to the south 50 acres, hence, was correctly decreed.

Proper, also, was the judgment in another suit, pending on appeal here, 223 La. 396, 65 So.2d 889, and consolidated with the instant cause, which ordered cancelled the instrument of date October 31, 1950 that purportedly transferred the lease as to the south 50 acres to R. C. Smith.

Plaintiff maintains, under an answer to defendants' appeal, that the lease as to the north 10 acres likewise should have been annulled, it contending that the one well located on the land is no longer producing oil in paying quantities.

On several occasions this court has considered the question of what is production sufficient and requisite for the continuance of a lease in force and effect after the expiration of its primary term. And for determining it the test applied has been whether the producing well or wells involved would provide a net profit to the lessee and furnish an adequate consideration to the lessor, the income of the latter from royalties being especially compared with the sums that he received in payment for the lease originally and for annual delay rentals. Caldwell v. Alton Oil Company, Inc., 161 La. 139, 108 So. 314, Logan v. Tholl Oil Company, Inc., 189 La. 645, 180 So. 473, Brown v. Sugar Creek Syndicate, 195 La. 865, 197 So. 583.

In the instant case the evidence discloses that from the 10 acres in question

the well produced in 1949 a total of 676 barrels of oil and in the first eleven months of 1950 (the trial occurred December 1 of that year) 444 barrels. The noticed decline in the production for the latter period was due largely to the development of a hole in the casing which necessitated the closing of the well for some 25 days. However, on the completion of repairs, at a cost to lessee of between $600 and $1,000, the output increased; and at the time of trial approximately 10 barrels per day were being pumped. Whether the increase would continue was problematical.

At the net price of $2.30 per barrel (10 cents was deducted from $2.40 for severance tax), the 1949 production was sold for $1,554.80, of which the lessor received as royalty one-eighth or $194.35 and the lessee (and his associates) $1,360.45. And the 1950 production (eleven months) yielded $1,021.20, of which the lessor was paid $127.65 and the lessee (and his associates) $893.55.

With respect to the defendant Smith, lessee of the 10 acres, the trial judge, in his well considered written opinion, correctly observed that " * * * the operation of this well is a profitable enterprise. He operates seven other wells in the immediate vicinity thereof (on the other leases) on a single power unit. He is shown to be an efficient operator, his operating cost being very moderate. These eight wells operated by Smith, including the well on the Noel ten acre tract, are

what are known in the oil industry as 'stripper wells' and large production from such wells is not expected or contemplated. The testimony is to the effect that the well on the Noel ten acre tract is about as good as any of the other seven wells operated by Smith, and better than some. According to a statement of operating expenses filed in evidence by Smith, the Noel well cost him $504.52 to operate during 1949 and $596.64 to operate during 1950. It will thus be seen that Smith had a profit of more than $700 on his operation in 1949 and a profit of over $300 [should be $296.-91] in 1950 (aside from the cost of reworking the well). The testimony shows that Smith, himself does most of the labor required to operate the wells and, under the circumstances, he is making a respectable income from his operations." (Brackets ours.)

We agree also that the well on the 10 acres furnished an adequate consideration to the lessor. Its royalty revenues therefrom, as before shown, were $194.35 in 1949 and $127.65 in 1950. Originally it received for the lease on the entire 60 acre tract only $150, which amounts to approximately $25 for the 10 acres in question; and the stipulated annual rentals, for keeping the lease in effect without drilling, was $1 per acre or $10 for 10 acres. Therefore, as the trial judge significantly states, " * * * The per acre revenue being received by plaintiff from the well on the ten acres in question is greatly in excess,

both for 1949 and 1950, of the per acre initial and renewal consideration stipulated in the lease contract itself."

In the above mentioned Caldwell case, relied on by plaintiff, a well producing five barrels per week was deemed insufficient production to continue the lease. But the opinion discloses that the production there, amounting to only $33.33 per year to the lessor, was from a lease covering 47 acres (almost five times the acreage presently under consideration), and that the price paid initially for such lease was $500. In contrast the instant well produced 13 barrels per week in 1949 and 9.25 barrels per week in 1950 from only 10 acres, the lease on which was originally valued at $25. Hence, on the facts the cases are not comparable.

Again, in Logan v. Tholl Oil Company, Inc., supra 189 La. 645, 180 So. 475, royalty of $5 per month was declared inadequate. However, the lease there was for 40 acres (four times the acreage involved here), and the court particularly pointed out that the primary term thereof "was eight months from the date of its execution for which a consideration of $1,200 was paid, with the right of a four months' extension upon the payment of $800 additional".

This court, on the other hand, held in Brown v. Sugar Creek Syndicate, supra, that sufficient was the production from a lease on 456 acres which paid to the lessor royalty of $100 per month for a six months' period, it especially noting that the annual delay rentals stipulated were $456. On the basis of 10 acres the royalty thus paid was $2.20 per month or $26.40 per year, an amount much less than that received by this lessor.

For the reasons assigned the judgment appealed from is affirmed.