278 So.2d 851 (1973)
SCURLOCK OIL COMPANY, Plaintiff-Appellee,
v.
GETTY OIL COMPANY et al., Defendants-Appellees,
Roger L. Bauman et al., Defendants-Appellants.
No. 4055.
Court of Appeal of Louisiana, Third Circuit.
May 30, 1973.
Rehearings Denied June 27, 1973.
*852 Duncan M. Smith, Jr., Lafayette, for defendants-appellants.
Bailey & Hollier, by W. C. Hollier, Lafayette, for plaintiff-appellee.
Robert Brinkman, Opelousas, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, by Lucius F. Suthon, Henican, James & Cleveland by Carl W. Cleveland, New Orleans, Liskow & Lewis, by James L. Pelletier, Lafayette, for defendants-appellees.
Before FRUGÉ, HOOD and DOMENGEAUX, JJ.
HOOD, Judge.
Scurlock Oil Company, the purchaser of condensate produced from a tract of land in St. Landry Parish, deposited the purchase price of that production in the registry of the court and provoked this concursus proceeding. A number of parties were impleaded. A claim for the amount deposited was asserted by a group of defendants, referred to herein as the "Waterbury Group," and a conflicting claim for the same proceeds was made by other defendants referred to as the "Bauman Group."
Following appropriate hearings, a summary judgment was rendered by the trial court in favor of the Waterbury Group, dismissing the claim of the Bauman Group. Judgment also was rendered sustaining an exception of res judicata filed by the Waterbury Group to the claim of the Bauman Group. And, finally, the judgment reserved to appropriate parties the claims asserted by them for reimbursement of drilling and other well costs. The Bauman Group appealed.
*853 A companion concursus proceeding was instituted by Louisiana Intrastate Gas Corporation, the purchaser of gas produced from property affected by said leases. The issues in that proceeding are identical to those which are presented here, and the cases were consolidated for trial and appeal. A judgment similar to the one appealed from in the instant suit was rendered in that case, and the Bauman Group appealed. We are rendering a separate judgment in that case on this date. See Louisiana Intrastate Gas Corporation v. Robert L. Waterbury et al., La.App., 278 So.2d 863.
The principal issues presented are: (1) Did the trial judge err in sustaining an exception of res judicata filed by Waterbury to the claim of the Bauman Group? (2) Did a release executed by Tidewater Oil Company on December 12, 1963, have the effect of cancelling lease interests previously acquired by the Waterbury Group? In order to resolve the last mentioned issue, it is necessary to determine whether a document executed by Tidewater on November 20, 1961, purporting to transfer rights under certain mineral leases to Alladin Oil Company, Inc., constituted a sublease or a partial assignment of those leases.
We will consider first the question of whether the release executed by Tidewater on December 12, 1963, had the effect of cancelling the leasehold interests of Waterbury.
The evidence shows that on July 30, 1954, Adler V. LeDoux and James Pitre executed an oil, gas and mineral lease in favor of F. J. Muller, covering 152 acres of land in St. Landry Parish. On July 29, 1954, Burice C. Bihm executed a mineral lease in favor of Muller, covering an adjacent six acre tract of land in St. Landry Parish. Each of these leases was for a primary term of five years, and for so long thereafter as oil, gas or some other mineral is being produced or drilling operations are conducted pursuant to the provisions of the lease. Muller assigned both of these leases to Tidewater Oil Company (now Getty Oil Company) on or about the dates on which the leases were executed.
Effective March 1, 1959, the Commissioner of Conservation created a drilling unit known as the "Cockfield No. 2 Sand Unit No. 21-2," which included a part of the surface acreage of property covered by both of the above mentioned leases and a part of the surface of an adjacent tract of land owned by defendant, Robert L. Waterbury. The unit covered a surface area of about 320 acres, and it controlled production from only one sand or strata, called the Cockfield No. 2 Sand. That sand was described in the order of the Department of Conservation as being "that gas-condensate bearing sand encountered between 10,376 feet and 10,410 feet in the Tidewater Oil CompanyJeanette R. Haas Well No. 1 located in Section 10, Township 6 South, Range 5 East." The order creating the units did not regulate production from any other sand.
Early in 1960, Tidewater drilled and completed the R. L. Waterbury Unit 21-2 Well, on property owned by Waterbury and located within the Cockfield No. 2 Sand Unit. The well produced from the Cockfield No. 2 Sand until August 6, 1960, but it was abandoned by Tidewater on that date. Waterbury undertook to rework that well, however, and he succeeded in restoring production from it in November, 1960. The well has continued to produce from the same sand since that time.
In June 5, 1961, Tidewater executed an instrument releasing from the above mentioned leases all of the property affected by those leases other than the acreage included within the boundaries of the Cockfield No. 2 Sand Unit. Although that release had the effect of cancelling the leases as to all other property, the leases remained in effect as to the acreage which was within the Cockfield No. 2 Sand Unit, and the leases continued to apply at least for some time thereafter to all production, *854 from any sands or strata, under the property included in the unit.
On November 20, 1961, Tidewater executed a document purporting to transfer the above mentioned leases to Alladin Oil Company, Inc., insofar only as those leases covered lands included in the Cockfield No. 2 Sand Unit, and insofar only as those leases affected or related to the Cockfield No. 2 Sand. One of the important issues presented in this case is whether that transfer from Tidewater to Alladin constituted a sublease or a partial assignment of those leases.
Shortly after Alladin Oil Company acquired the above mentioned lease interests, it conveyed or transferred those interests to defendant, Robert L. Waterbury, who contends in this proceeding that he still owns the leases, insofar as they cover the property included in the 320 acre unit and insofar as those leases affect the Cockfield No. 2 Sand. The two leases affected by these transfers are sometimes referred to herein as the Waterbury leases.
On June 23, 1961, the owners of the 152 acre tract which had been leased to Muller seven years earlier executed a second mineral lease covering the same property in favor of Vernon J. Main, Jr. On the same date the owners of the adjacent six acre tract which had been leased to Muller also executed a second lease covering the same six acres, in favor of Main. Shortly thereafter, Main transferred both of these leases to the "Bauman Group," and those leases are sometimes referred to herein as the Bauman leases. All parties concede that the Bauman leases are "top leases," and that they cannot become effective as to the property or rights covered by the Waterbury leases until the latter, the Waterbury leases, have been cancelled or terminated.
On July 12, 1963, Tidewater executed a document by which it purports to release all of its rights in the Waterbury leases. The document recites that for good and valuable consideration, Tidewater "... does hereby release, relinquish and quitclaim all of its right, title and interest in and to ..." the two leases which the landowners had granted to Muller in 1954. The leases were accurately described in the release, and the document contains no reference to the earlier transfers from Tidewater to Alladin, or from Alladin to Waterbury, or to production from the Cockfield No. 2 Sand.
Scurlock Oil Company purchased condenstate produced from the Cockfield No. 2 Sand, through wells located on property within the unit, and Louisiana Intrastate Gas Corporation purchased gas produced from the same sand. A dispute arose as to whether the instrument executed by Tidewater on July 12, 1963, purporting to release the Waterbury leases, had the effect of cancelling the lease interests which Waterbury had acquired from Alladin. The Waterbury Group contends primarily that the transaction entered into between Tidewater and Alladin on November 20, 1961, constituted a partial assignment of the Waterbury leases, that each of the original leases was divided and Tidewater thereafter had no interest in and no right to cancel the part of them which had been assigned to Alladin (and later to Waterbury), and that the release executed by Tidewater in 1963 thus did not cancel or terminate the part of the leases which Waterbury had acquired. The Bauman Group contends that the transaction between Tidewater and Alladin constituted a sublease, and that Tidewater as the principal lessee had the right to cancel each lease in its entirety. It is argued that the release which Tidewater executed in 1963 had the effect of cancelling the sublease held by Waterbury, thus permitting the Bauman top leases to become effective covering all property in the unit, including the Cockfield No. 2 Sand.
We have concluded that the agreement entered into between Tidewater and Alladin on November 20, 1961, constituted a sublease, and that the release which was *855 executed by Tidewater on July 12, 1963, had the effect of terminating the Waterbury leases completely, including the interest in those leases which had been acquired by Alladin, and later by the Waterbury Group.
The transfer from Tidewater to Alladin, dated November 20, 1961, recites that Tidewater "... does hereby grant, bargain, sell and assign . . ." the leases therein described to Alladin Oil Company, Inc. It provides further that the transfer was made "Insofar and only insofar as the above leases cover and affect ..." the 320 acres included in the unit, and "insofar and only insofar as said leases cover and affect the Cockfield No. 2 Sand ..." It concludes with the following stipulation:
"This assignment does not in any way affect the said leases hereinabove described insofar as they cover lands not included within the said 320 acre tract hereinabove described, and this said assignment does not in any way affect the said leases insofar as they cover sands other than the Cockfield No. 2 Sand as heretofore defined."
The Waterbury Group points out that the words "assign" and "assignment" were used in that transfer, and that Tidewater retained no interest in the part of the lease which was transferred. They argue that the parties thus intended for the transaction to be an absolute assignment of a partial interest in the lease.
The general rule is that the transaction will be regarded as a partial assignment of the lease, rather than a sublease, if the principal lessee transfers his entire interest in the lease insofar as it affects a part of the leased property, and he retains no interest in or control over the part of the property included in the assignment. If the principal lessee, on the other hand, retains an interest in the lease insofar as it affects the part of the leased property involved in the transfer, then the transaction will be considered to be a sublease. Smith v. Sun Oil Co., 165 La. 907, 116 So. 379 (1928); Roberson v. Pioneer Gas Co., 173 La. 313, 137 So. 46 (1931); Broussard v. Hassie Hunt Trust, 231 La. 474, 91 So.2d 762 (1956); Bond v. Midstates Oil Corp., 219 La. 415, 53 So.2d 149 (1951); Prestridge v. Humble Oil & Refining Co., 131 So.2d 810 (La.App. 3 Cir. 1961).
In Roberson v. Pioneer Gas Co., supra, our Supreme Court stated the applicable rule as follows:
"The distinction between an assignment of a lease and a sublease is that, in an assignment, the assignor transfers his entire interest in the lease insofar as it affects the property on which the lease is assigned; whereas, in a sublease, the original lessee, or sublessor, retains an interest in the lease insofar as it affects the property subleasedby imposing some obligation upon the sublessee in favor of the sublessor, such as an obligation to pay additional rent to the sublessor."
The distinction between a sublease and a partial assignment was explained in Broussard v. Hassie Hunt Trust, supra, as follows:
"An assignment has been differentiated from a sublease by this Court on many occasions, the distinction being that `* * * in an assignment the original lessee transfers all of his rights in the lease; whereas in a sublease he retains some control or interest in it.' Bond v. Midstates Oil Corp., 219 La. 415, 428, 53 So.2d 149, 153."
And, in Stacy v. Midstates Oil Corp., 214 La. 173, 36 So.2d 714 (1948), the court held:
"The reason for that distinction is that, in the case of a sublease of a part of the leased land, the original lessee does not rid himself of all interest in and authority over the land subleased; whereas, if there is no such reservation on the part of the original lessee, his assignee acquires complete control over that part of the lease which is assigned."
*856 Every Louisiana case which has been pointed out to us involved the transfer of a lease interest affecting a part of the surface acreage covered by the lease. The question presented in each such case, therefore, was whether there could be a "vertical" segregation of the lease. In the instant suit a question is presented as to whether the lease can be segregated or divided "horizontally," that is, whether a partial assignment, and thus a division, of the lease can be made affecting only one sand, or one stratum, or one plane running parallel to the horizon or surface of the land.
The following statement appears in Williams and Meyers, Oil and Gas Law, Sec. 413.1, page 327, to-wit:
"We know of no specific case authority on the effect of a partial assignment of a particular strata or formation, e. g., an assignment of strata at a depth in excess of 3,000 feet, but one commentator has suggested that such a transfer would be classified as an assignment, rather than as a sublease in Louisiana."
The Louisiana authority referred to in the quoted part of the text is found in Vol. III, Third Annual Institute on Mineral Law, Louisiana State University (1955), page 196, where the Honorable John H. Tucker, Jr., an eminent authority on oil and gas law, expressed the view that the horizontal partial assignment of a lease should be treated in the same manner as a vertical assignment. See also, Niblack, Some Consequences of Horizontal Division of Oil and Gas Leaseholds, Eighth Annual Rocky Mountain Mineral Law Institute (1963), page 1.
We agree that under some circumstances a mineral lease can be horizontally segregated, and that the principal lessee conceivably could effect a partial assignment of the lease insofar as it covers only a particular sand or stratum. We have concluded, however, that regardless of what might have been legally possible, there has been no horizontal segregation of the leases in the instant suit, and that the 1961 transfer from Tidewater to Alladin was in fact a sublease, and not a partial assignment, of the Waterbury leases.
The above conclusions are compelled, we think, for two reasons. The first is that the principal lessee retained an interest in and some rights under the leases involved in the transfer. Under the authorities above cited, therefore, the transfer from Tidewater to Alladin must be construed to be a sublease rather than a partial assignment.
Each of the two Waterbury leases covers a specific tract of land. One covers 158 surface acres and the other six acres. Each contract provides that the lessee shall have the "exclusive right to enter upon and use the land ... for the exploration for and the production of oil, gas, sulphur and all other minerals, together with the use of the surface of the land for all purposes incident to the exploration for production, ownership, possession and transportation of said minerals ... and the right of ingress and egress to and from said lands at all times for such purposes, including the right to construct, maintain and use roads and/or canals ..., and including the right to remove from the land any property placed by Lessee therein and to draw and remove casing from wells drilled by Lessee on said land ..." These leases thus give to the lessee a substantial number of rights relating to the surface of the leased land.
In the 1961 transfer of an interest in those leases, Tidewater granted to Alladin the right to use the surface of all of the land covered by the leases for the above mentioned purposes. But we think Tidewater also reserved to itself the right to continue to use the surface of the same leased premises for the same purposes, although it could no longer keep the minerals produced from the Cockfield No. 2 Sand. Tidewater thus reserved an interest in, or some rights under, at least those *857 parts of the lease contracts which relate to the use of the surface of the same lands which were included in the transfer to Alladin.
Each of the Waterbury leases also provided that after the primary term expired, the leases would remain in effect as long as oil, gas or some other mineral is being produced from, or drilling operations are conducted on, the leased land or on acreage pooled therewith. If the transfer from Tidewater to Alladin had effected a horizontal segregation or division of the leases, then the production obtained from the R. L. Waterbury Unit 21-2 Well, or from any other well producing from the Cockfield No. 2 Sand, would no longer have continued the leases in effect as to any other sand. Under that theory, the lease interest retained by Tidewater would have become a separate and independent lease, and it would have expired in 90 days after the transfer of November 20, 1961, since no other drilling operations were commenced within that time and no production was obtained from any other sand under the leased property. Smith v. Sun Oil Co., supra. We do not believe that the parties intended for the transfer to Alladin in 1961 to have the effect of dividing the leases, and thus of terminating the interest in the leases which had been retained by Tidewater. If production from the R. L. Waterbury Unit 21-2 Well had ceased between November 20, 1961 and July 12, 1963, but drilling operations had been commenced on the leased property within 90 days thereafter, then we think the commencing of drilling operations within that time would have continued the leases in effect, even though the drilling operations might have been conducted by Alladin, or its transferees, and production had been obtained only from the Cockfield No. 2 Sand. In our view, therefore, the principal lessee, Tidewater, retained the additional right to have its interest in the leases extended by drilling operations conducted by Alladin, or by production from the Cockfield No. 2 Sand.
Each of the Waterbury leases provides that the lease may be extended from year to year during the primary term, upon payment of the delay rentals specified therein. The transfer of an interest in the leases to Alladin in 1961 occurred after the primary terms of the leases had expired, but the rule which we apply here would also be applicable in a case where the transfer is made during the primary term. It thus is pertinent to consider what the relationship of the parties would have been if the transfer to Alladin had occurred during the primary term of the lease. We believe that the payment of a delay rental during the primary term by Alladin would have benefited Tidewater, as well as Alladin, by continuing the leases in effect as to the principal lessee. Tidewater, therefore, had an interest in both of these leases, in that it would benefit from payment of delay rentals made by Alladin.
Each lease gives the lessee the right to inject gas, water, brine or other fluids into subsurface strata. It is unnecessary for us to consider whether this would give the principal lessee the right to inject such fluids into the Cockfield No. 2 Sand, but certainly Tidewater reserved the right to use the surface of the same land which was affected by the transfer for the purpose of injecting fluids into some subsurface strata, and reserved the right to drill through the Cockfield No. 2 Sand for that or for any other purpose consistent with the terms of the leases.
It is apparent, therefore, that Tidewater retained a substantial interest in and control over the part of the lease interests which were conveyed to Alladin in 1961. The transfer thus cannot be said to be an assignment, or a partial assignment, of the leases.
Our second reason for concluding that the transfer from Tidewater to Alladin must be regarded as a sublease, rather than an assignment, is that the original leases did not authorize the horizontal segregation or division of either of those leases.
*858 A lessee does not have the right to segregate or to divide a lease contract into two or more separate leases unless the lessor agrees to such a division, or unless the original lease contract gives the lessee the right to effect such a division. Noel Estate v. Murray, 223 La. 387, 65 So.2d 886 (1953); Roberson v. Pioneer Gas Co., supra; Smith v. Sun Oil Co., supra, and Fisher v. Crescent Oil Co., Tex.Civ.App., 178 S.W. 905 (1915).
Each of the Waterbury leases contains a provision authorizing the lessee to release any portion of the lands covered by the lease, and it provides that if he does so during the primary term the rental shall be reduced proportionately according to acreage. That stipulation does not authorize a division of the lease into two or more independent leases. It merely authorizes the lessee to release to the lessor a part of the lands covered by the lease. But, the contract indicates that even a release of that kind should be "according to acreage."
The most pertinent provision of the leases relating to the lessee's right to segregate or divide the lease reads as follows:
"In the event of the assignment of this lease either as to a segregated portion of the land or as to an undivided interest in the lease contract delay rentals shall be apportioned among the several leasehold owners according to the surface area, or the undivided interest of each and default in payment by one shall not affect the rights of others."
This quoted provision in the leases authorizes the lessee to divide and to make a partial assignment of each such lease only (1) as to a segregated portion of the land, or (2) as to an undivided interest in the lease contract. No one claims that Alladin acquired an undivided interest in the leases by virtue of the document executed by Tidewater in 1961. The question presented is whether that transaction constituted a partial assignment of the leases "as to a segregated portion of the land."
The lease provides that in the event an assignment is made as to a segregated portion of the land, the delay rentals shall be apportioned among the several leasehold owners "according to the surface area." This indicates to us that the term "segregated portion of the land," was intended to refer to a segregation or division of the lease according to surface acreage. We do not believe that the parties contemplated that the lessee could assign the lease as to a particular sand or stratum, and thus segregate the lease horizontally.
Our conclusion is that the document executed by Tidewater on November 20, 1961, constituted a sublease, rather than a partial assignment of leases, to Alladin. Since Tidewater was the principal lessee, and the leases were not segregated or divided, the release executed by Tidewater on July 12, 1963, had the effect of cancelling the Waterbury leases in their entirety, including the subleases which eventually were acquired by the Waterbury Group.
The Waterbury Group contends, alternatively, that even if its interests are considered to be a sublease, the release executed by Tidewater on July 12, 1963, was not intended to cancel the leasehold interests owned by Waterbury. They argue that the release, when read with a "letter agreement" executed contemporaneously with that release, shows that neither Tidewater nor the landowners intended for the above mentioned release to affect the sublease held by the Waterbury Group.
The release executed by Tidewater recites that for good and valuable considerations it "does hereby release, relinquish and quitclaim all of its right, title and interest in and to" the Waterbury leases. The "letter agreement" to which the Waterbury Group refers is a letter, dated June 13, 1963, written to Tidewater Oil Company by the Honorable Duncan M. Smith, *859 Jr., who is counsel for the Bauman Group in the instant suit. At the time that letter was written, however, Mr. Smith was counsel for the landowners in an action which the latter had instituted against Tidewater and others, relating to the leases which are at issue here, and the letter was written in connection with that suit. See House v. Tidewater Oil Company, 219 So.2d 616 (La.App. 3 Cir. 1969). The pertinent portion of the letter reads as follows:
"In consideration of your payment of $2,750.00 to the undersigned attorneys for the plaintiffs in the above captioned case and the release of your retained rights in the oil, gas and mineral leases involved in the said case, we do hereby agree that in the event a judgment is awarded in favor of the plaintiff and attorney's fees are granted, then we will enforce collection of one-third of the total of any attorney's fees awarded against Alladin Oil Company and one-third of said fees against Robert L. Waterbury."
The Waterbury Group argues that the use in that letter of the words "release of your retained rights" shows that the purpose of the release was to surrender only the rights which Tidewater had retained or reserved in the leases, and not to release any rights which had been conveyed to Alladin. They contend that the release was executed by Tidewater pursuant to a settlement agreement entered into in connection with the earlier suit, and that when this release is considered in connection with that settlement and with the prior release of acreage outside the unit, it is obvious that the "retained rights" mentioned in the letter referred to the rights which were still held by Tidewater, and not to those which had been transferred to Alladin.
We cannot agree with that argument. There is no ambiguity in the release which was executed by Tidewater. The letter upon which the Waterbury Group relies was written almost a month before the release was signed, and we do not know whether there were any additional negotiations between the parties during that interval. There is no mention of the letter in the release, and as we have already noted the release does not refer to the lease interests which had been acquired by the Waterbury Group, or to the Cockfield No. 2 Sand.
We believe that if Tidewater had intended for the release to cancel only its interest in the lease, and not that of the sublessee, some mention of that fact would have been made in the release. Our conclusion is that the parties intended for the release to cancel the Waterbury leases in their entirety.
We turn now to the issues presented by the exception of res judicata filed by the Waterbury Group to the claim of the Bauman Group.
The landowners instituted a suit against Tidewater, Alladin and Robert L. Waterbury on September 6, 1962, seeking a judgment decreeing the Waterbury leases to be terminated and of no further force and effect, and for damages and attorney's fees. The case was tried, and judgment was rendered by the trial court on May 6, 1968, in favor of defendants and against plaintiffs, dismissing the suit. The plaintiffs appealed, and we render judgment affirming the trial court judgment. House v. Tidewater Oil Company, 219 So.2d 616 (La.App. 3 Cir.1969).
The exceptions of res judicata filed by the Waterbury Group in this proceeding are based on allegations that the earlier suit and the instant proceeding were founded on the same cause action, that the demands are for the same thing, that the actions are between the same parties, and that the judgment rendered in the earlier suit bars the Bauman Group from asserting its claim here.
Article 2286 of the Louisiana Civil Code provides:
"The authority of the thing adjudged takes place only with respect to what *860 was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality." (Emphasis added).
We have concluded that the demands in the former suit and the demand in the instant suit are not founded on the same cause of action, and that for that reason alone the exceptions of res judicata filed by the Waterbury Group must be overruled.
In the original suit instituted by the landowners against the lessee and sublessees, a judgment was sought decreeing the Waterbury leases to be terminated. The principal grounds alleged by plaintiffs for that relief was that the unit well had ceased to produce on October 6, 1960, that additional drilling or reworking operations were not commenced within 90 days thereafter as required in the leases, and that production from the leased premises was not resumed within that 90 day period. Plaintiffs also alleged, as alternative grounds, that: (1) The unit well produced as an oil well and not as a gas or condensate well from January 1 to October 1, 1961, and that the production of oil was not sufficient to maintain the leases within the gas and condensate unit created by the Department of Conservation; (2) the above mentioned unit was dissolved by order of the Department of Conservation dated November 7, 1961; and (3) royalties due from the unit well were not paid promptly as required by the leases. The trial court rejected plaintiff's demands on all of those grounds and rendered judgment in favor of defendants.
The Bauman Group were not made parties to the original suit instituted by the landowners, although the landowners had granted top leases to them affecting the same property more than a year before that suit was filed.
The instant concursus proceeding was instituted on September 4, 1970, and the parties included in the Bauman Group are parties to this action. We have already noted that the Bauman Group and the Waterbury Group have submitted conflicting claims to the proceeds of the sale of gas and condensate produced from the unit well. Although the principal issue to be determined here is which of the two groups of defendants is entitled to these proceeds, it is necessary in resolving that issue to determine whether the Waterbury leases have been in effect since July 12, 1963. The Bauman Group contends that the Waterbury leases were terminated in their entirety by the release executed by Tidewater on July 12, 1963, more than ten months after the original suit was instituted by the landowners. The Waterbury Group contends that the release did not terminate the interest which they previously had acquired in the leases. The signing of that release was not alleged or mentioned in the earlier suit, and the granting of such a release thus did not constitute a part of the cause of action in that suit.
The Waterbury Group contends that the execution of the release by Tidewater on July 12, 1963, was concealed from the defendants in the first suit, and was not recorded until after judgment had been rendered in that action. They take the position that the failure of the landowners to amend their pleadings and to allege this additional ground for cancellation bars their lessees, the Bauman Group, from raising that issue now. Their argument is that the bar of res judicata encompasses not only issued actually raised, but also all issues which might have been raised. A number of cases are cited in support of that argument, the principal ones being Brooks v. Magee, 126 La. 388, 52 So. 551 (1910), and Succession of Reynolds, 231 La. 410, 91 So.2d 584 (1956).
We find no merit to that argument. The release was signed long after the original suit was filed. It constituted an entirely *861 separate ground or cause of action for judgment decreeing the leases to be terminated. An action to enforce the 1963 release would be different from one based on breach of the early lease contracts. And, the relief sought would be different, in that the effective date of the alleged termination would be later than the dates originally alleged. Under these circumstances we do not feel that the plaintiffs-landowners were under a duty in the earlier suit to allege this release as an additional ground for cancelling the Waterbury leases.
We conclude that the demand of the landowners in the original suit, and the demand of the Bauman Group in the instant proceedings, are not founded on the same cause of action, and that the trial judge thus erred in sustaining the exceptions of res judicata filed by the Waterbury Group.
Having concluded that the exceptions of res judicata are without merit for the above mentioned reasons, it is unnecessary for us to consider the additional arguments urged by the Bauman Group that the actions were not between the same parties.
Our ultimate conclusion is that the trial court erred in rendering a summary judgment in favor of the Waterbury Group, in sustaining the exceptions of res judicata filed by that group of defendants, and in dismissing the claim of the Bauman Group.
For the reasons assigned, we hereby reverse the judgment appealed from insofar as it: (1) Grants a summary judgment in favor of Robert L. Waterbury and Alladin Oil Company, Inc., and its successors and assigns; (2) sustains the exceptions of res judicata filed by the Waterbury Group; and (3) dismisses with prejudice the claim of the Bauman Group at the cost of respondents. We affirm the judgment appealed from insofar as it: (1) Reserves to interested parties the right to claim reimbursement of drilling costs, development costs, operating costs and other well costs; and (2) decrees that pending final determination of the amounts and validity of the claims just mentioned the funds deposited in custodia legis shall not be disbursed except on further orders of the court for good and proper cause shown. Judgment is hereby rendered remanding the case to the trial court for further proceedings consistent with the views herein expressed. The costs of this appeal are assessed to the defendants-appellees who are identified as the Waterbury Group.
Affirmed in part, reversed in part and remanded.
FRUGÉ, J., dissents with written reasons.
FRUGÉ, Judge (dissenting).
The applicable law on the subject of res judicata is Article 2286 of the LSA-C.C. which provides:
"The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality."
It is obvious that the rights of the parties, or their respective claims to be determined in both suits, were dependent solely upon the validity or invalidity of the Waterbury Leases. That was the main issue in the prior suit; that remains the main issue in this suit. This pivotal question was decided in the former suit. See: The Work of the Louisiana Appellate Courts for the 1967-1968 Term-Procedure, 29 La.Law Rev. 269, 283 (1969); Succession of Marlin, 240 So.2d 387 (La.App. 2nd Cir., 1970); Johnson v. Lemons, 157 So.2d 752 (La.App. 2nd Cir., 1963), and Succession of Reynolds, 231 La. 410, 91 So.2d 584 (1956).
In disposing of a plea of res judicata it may become necessary to determine whether *862 the second action depends upon a fact put at issue and determined in the prior proceeding. In the present instance it has been shown that such was the case. Coates Equipment and Service, Inc. v. Glover, 181 So.2d 455 (La.App. 1st Cir., 1965).
The "thing demanded" in the original proceeding was cancellation of the Waterbury Lease. In the case at bar, not only is the "thing demanded" the same, but the demand is also founded upon the same cause of action. 2 La.Law Rev. 347 (1940).
It is true, as argued by appellants, that the parties in the two suits are not identically the same, however, in Quinette v. Delhommer, 247 La. 1121, 176 So.2d 399, 405 (1965), the Louisiana Supreme Court recognized that successors are considered "parties" under C.C. 2286:
"As explained by Pothier, the successors are considered `as parties themselves'. I Pothier On Obligations (3rd ed. 1853, Translation by William David Evans), Article V [53], p. 588."
The term "successors" has been used in our jurisprudence interchangeably with the word "privies". In California Company v. Price, 234 La. 338, 99 So.2d 743 (1957), the Louisiana Supreme Court held:
"It is the settled jurisprudence of this court that matters once determined by a court of competent jurisdiction, if the judgment has become final, can never again be called into question by the parties or their privies, though the judgment may have been erroneous and liable to certain reversal on appeal." 99 So.2d at 747 (Emphasis ours).
I find that a judgment inconclusive of the issues involved in a controversy, as between the parties and the person in privity with them, although in the action in which such conclusiveness is asserted only some of the parties are litigants, or although in the subsequent action others are joined as parties. Therefore, the subsequent addition of Vernon Main, Jim Braden, Mrs. Mildred Bollman, Donald Bollman, Roger Bauman, Jon Rogers Bauman Trust Estate, Michael Collins Bauman Trust Estate, and Mrs. Betty Jane Garber Ellis, should not prevent the application of the doctrine of res judicata.
After holding that the former judgment does not constitute res judicata in this action, the majority finds that the conveyance by Tidewater to Aladdin was a sublease rather than an assignment. The majority's determination that the conveyance was a sublease works a very iniquitous result; with it, I cannot agree.
Under Louisiana Law, the lessee of an oil, gas, and mineral lease has the power to transfer his interest by assignment in full, partial assignment or sublease, unless the lease itself prohibits a transfer. This right is provided for in Article 2725 of the Louisiana Civil Code. Moses, "Assignments and Subleases of Oil, Gas and Mineral Leases in Louisiana: Their Differentiation", 23 Tul.L.Rev. 231 (1948). The type of transfer here discussed is permissible, absent an express contrary provision in the lease.
The distinction between "an assignment of lease" and a "sublease" is that in the former, the assignor transfers his entire interest in the lease insofar as it affects the property on which the lease is assigned, whereas in the latter, the original lessee or sublessor retains an interest in the lease insofar as it affects the property subleased by imposing some obligation upon the sublessee in favor of the sublessor. Smith v. Sun Oil Company, 165 La. 907, 116 So. 379 (1928); Roberson v. Pioneer Gas Company, 173 La. 313, 137 So. 46 (1931); Stacy v. Midstates Oil Corporation, 214 La. 173, 36 So.2d 714 (1948); Noel Estate, Inc. v. Murray, 223 La. 387, 65 So.2d 886 (1953), and Prestridge v. Humble Oil and Refining Company, 131 So.2d 810 (La.App.3rd Cir., 1961).
*863 I have found no case in our Louisiana jurisprudence which considers whether a horizontal assignment is valid. However, innumerable cases from our sister states have been found to bear on the question; without exception horizontal assignments are recognized. William and Meyers, Oil and Gas Law, Vol. II, § 402-416 (1959). The jurisprudence of this state has recognized vertical partial assignments of oil, gas, and mineral leases, and I see no reason why, similarly, we should not recognize a horizontal partial assignment of a lease. Summers, Oil and Gas, Vol. III, § 553.1 (1958). Once a lease is found to be divisible, a horizontal division of that lease by assignment of a particular strata or sand is a proper extension of the proposition which allows a vertical partial assignment of the lease. See: Tucker, "Sub-Lease and Assignment; Some of the Problems Resulting from the Distinction", 3 L. S.U.Min.L.Inst. 176, 196 (1955); William and Meyers, Oil and Gas Law, Vol. II, § 404, 413.1, 416 (1965), and Niblack, "Some Consequences of Horizontal Division of Oil and Gas Leaseholds", 8 Annual Rocky Mt.Min.L.Inst. 1 (1963).
From a review of the jurisprudence beginning with Smith v. Sun Oil, supra, I am convinced that the conveyance from Tidewater to Aladdin was a partial assignment and not a sublease inasmuch as Tidewater neither reserved nor retained any rights under the lease as to the land conveyed (Cockfield No. 2 Sand). Obviously, Tidewater did retain rights to the land above and below the Cockfield No. 2 Sand, but this does not prevent the instrument from being a partial assignment because as regards the land conveyed, there were no rights reserved. Additionally, a reading of the instrument shows clearly that there were no additional obligations imposed upon Aladdin.
For the foregoing reasons, I find the judgment of the District Court should have been affirmed and, therefore, respectfully dissent from the majority opinion.