CARAWAY, J.
LThe trial court determined that a $7.6 million payment and a higher lease royalty were owed to the plaintiffAessor under a mineral lease because of the operation of a so-called most favored nations clause in the lease. The clause required a bonus-related payment and higher royalty for the lessor in the event that the original lessee or its “successors and assigns” acquired other nearby leases for a higher bonus or royalty. The defendani/lessee transferred an undivided one-half interest in the lease pertaining to the deeper zones of production, and its transferee thereafter acquired third party mineral leases for higher per acre bonus payments and greater royalties. Plaintiff sued to enforce the most favored nations clause, and the trial court found that the most favored nations clause required the original lessee to make the higher bonus-related payment and increase the lessor’s royalty to 30%. The original lessee appeals the adverse ruling, and the plaintiffAessor also appeals seeking amendment of the judgment to require payment of the $7.6 million judgment from *161 both the original lessee and its transferee. We affirm the trial court’s judgment against the original lessee and amend the judgment to make both co-owners of the lease responsible for the money judgment.

Facts

Hoover Tree Farm, L.L.C. (“Hoover”)[1] owns approximately 317 acres of land in Caddo Parish, located in Section 4, Township 18 North, Range 15 |2West and Sections 32 and 33, Township 19 North, Range 15 West. In early April of 2008, a representative of Petróleo Properties, LLC (“Petróleo”) contacted Hoover regarding the extension of an on oil, gas and mineral lease on the property which was to expire in November of 2008. Petróleo acted as broker for Goodrich Petroleum Company, L.L.C. (“Goodrich”) which owned the existing lease.[2] After preliminary negotiations, Hoover declined to extend the lease. Thereafter, representatives of Petróleo contacted Jeffrey Pou, senior landman for Goodrich, for assistance in negotiating the lease. Pou then offered on behalf of Goodrich a new lease for a $1,000 per acre bonus and a 25% royalty, which was an increase over the 20% royalty of the existing lease. Although Pou reported that Hoover voiced no concerns about competing lease bonus and royalty amounts, Pou offered Hoover a most favored nations clause which would secure for Hoover a similar bonus and royalty that others were receiving at the time.
On April 29, 2008, Pou sent a “Letter Agreement” to Josephine Doll Hoover “to allay the Plaintiffs concern about Goodrich paying another lessor a higher bonus or higher royalty percentage,”[3] including an initial draft version of a most favored nations clause (hereinafter the “MFN Draft”):
2. The Lessee’s (sic)(Goodrich, Sendero and Caddo Resources) guarantees (sic) that no Lessor shall receive a higher royalty and/or bonus than the Lessor shown above. Should any Lessor receive such higher bonus and/or royalty, the above Lessor’s bonus and/or royalty shall automatically be increased to that higher |samount. This clause will remain in full force and effect until Lessee’s (sic) drill on any Section mentioned in the above lease which at that time this clause will become null and void. This clause covers every section in the following Township-Ranges: (19N-16W), (19N-15W), (18N-16W), (18N-15W).
Upon receipt of the Letter Agreement, Hoover secured the services of attorney Jeffrey Weiss for representation regarding the proposed lease and its provisions. It is undisputed that Weiss modified Pou’s version of the most favored nations clause. Weiss stated that he was “trying to broaden” Pou’s MFN Draft when he revised the clause which ultimately was included in the new lease.
After the completion of these negotiations on May 1, 2008, Hoover entered into a two-year oil, gas and mineral lease (“the Lease”) with Petróleo, as Goodrich’s broker,[4] granting Hoover a 25% royalty and a *162 $1,000 per acre lease bonus. Paragraph 30, which was included as a special provision added to the printed form Lease, contained the following language:
30. Lessee and Goodrich Petroleum Company, L.L.C., which joins herein, each guarantee that no lessor of either Lessee or Goodrich Petroleum or then-successors and assigns shall receive a higher royalty and/or bonus than the Lessor under this Lease. Should any lessor receive such higher bonus and/or royalty, the Lessor under this Lease shall receive from Goodrich Petroleum Company, L.L.C. the difference between the higher bonus and the bonus paid to Lessor at the inception of this Lease, and the difference between the higher royalty and the royalty paid to Lessor under this Lease. This clause will remain in effect separately with respect to each Section covered by this Lease, and with respect to each such Section, this clause will remain in full force and effect until the end of the Primary Term of this Lease. This clause covers every lease which may be made by Lessee, Goodrich Petroleum Company, L.L.C., Sendero Resources | ¿Incorporated and/or Caddo Resources LP, as Lessee, and their respective successors and assigns, in any section in any of the following townships and ranges in Caddo Parish, Louisiana: (19N-16W), (19N-15W), (18N-16W), and (18N-15W).
This most favored nations clause (the “MFN clause”) is the source of the present litigation.
Effective on June 6, 2008, Goodrich and Chesapeake Louisiana, LP (hereinafter “Chesapeake”) entered into an “Assignment, Conveyance and Bill of Sale” (hereinafter “the Transfer”) “for and in consideration of the sum of Ten and No/100 dollars ($10.00), cash in hand paid, and other good and valuable consideration,” by which Goodrich “Granted, Sold, Assigned, Conveyed and Delivered,” to Chesapeake an undivided 50% interest in the Lease and various other leases as to all depths below the Cotton Valley formation. The Transfer contained no provisions for payment to Goodrich in the nature of an overriding royalty.
After its agreement with Goodrich, Chesapeake obtained oil and gas leases (hereinafter the “third party leases”) which paid a $25,000 per acre lease bonus to the lessor and a 30% lease royalty on property located within the area[5] established by the MFN clause.[6] Claiming that the payment of the higher lease bonus and royalties for the third party leases triggered the | sapplication of the MFN clause, Hoover instituted suit against Petróleo,[7] *163 Goodrich and Chesapeake. Specifically, Hoover alleges that “by virtue of the Assignment, Defendant Chesapeake is a ‘successor’ and an ‘assign’ of Defendant Goodrich” which “entered into other mineral leases in the townships and ranges covered by the Most Favored Nation Clause of the Lease, pursuant to which Defendant Chesapeake paid lessors a higher bonus than Defendant Goodrich/Defendant Petróleo paid to Hoover under the Lease.” Thus, Hoover claims its entitlement to “the difference between the highest lease bonus” paid for a third party lease and the bonus it received under the Lease and an increase in its royalty amount.
On September 28, 2009, Hoover filed a motion for summary judgment on the grounds that “as a matter of contract, Chesapeake is a ‘successor’ and ‘an assign’ of Goodrich with respect to rights in the lease.” Hoover also argued that the provisions of La. R.S. 31:128 permitted plaintiffs to demand performance of all defendants. Hoover contended that Chesapeake’s payment of a $25,000 per acre lease bonus and its granting of a 30% royalty to other lessors entitled them to the sum of $7,608,000 (317 acres x $24,000) and a 30% royalty for the Lease. In support of the summary judgment, Hoover attached copies of the Lease, the Transfer and spreadsheets allegedly produced by Chesapeake in discovery revealing the third party leases in which the higher lease bonus and royalties were paid.[8]
|Both Chesapeake and Goodrich opposed Hoover’s summary judgment, and eventually each filed a cross-motion for summary judgment urging that the MFN clause was never triggered. Specifically, the defendants argued that the transfer which they executed was a sublease and not an assignment. Chesapeake alternatively argued that if the clause was triggered, only Goodrich was liable because the terms of the lease clearly provided for recovery from Goodrich alone.
In support of the defendants’ motions for summary judgment, they offered copies of Pou’s April 29, 2008 “Letter Agreement” with the MFN Draft, the Lease and the Transfer. The deposition of Dr. Andrew Hoover, who negotiated for Hoover, was also submitted. Dr. Hoover testified that, after declining an initial offer to lease, he spoke to Pou. Pou persuaded Dr. Hoover to negotiate the lease early to ensure that Hoover would receive a $1,000 bonus and 25% royalty since drilling might take place on the property and extend the existing lease before its November expiration date. It was then that Dr. Hoover contacted Weiss for advice. Dr. Hoover stated that he and his brother “wanted a minimum 25% royalty and we wanted as much bonus money as we could get,” although they had not discussed an exact amount. Dr. Hoover testified that at the beginning of the negotiations, he did not know much about the Haynesville Shale. As he got into these negotiations, however, he discovered more about it, including “what other people were getting in the area.”
In the context of the lease negotiations, Dr. Hoover testified that he first heard the term, most favored nations clause, from Pou who told him |7that Goodrich “would guarantee that if any other landowner were to get more lease money than we got, that we would get the same bonus and royalty that that other person got.” Dr. *164 Hoover had not asked for such a term; he did not have any understanding of what Pou intended by the clause. He believed that Pou offered this to him “to get us to sign the contract.” Finally, Dr. Hoover did not recall seeing the April 29, 2008 Letter Agreement.
The affidavit of Pou was also submitted in support of the defendants’ motions for summary judgment. He began negotiations with Dr. Hoover in April of 2008 and then was contacted by Weiss regarding the lease negotiations. Pou stated that all special provisions added by exhibit to the Lease were “drafted” by Weiss. Thus, Pou contended that the MFN clause was Weiss’s provision. Pou understood the clause to mean “that if Goodrich paid a lessor over $1,000 per acre in the townships and ranges where the Hoover Tree Farm property was located, then Goodrich would have to increase the bonus payments made to Hoover Tree Farm to the highest bonus amount paid.” The same was true for the payment of a higher royalty by Goodrich. Pou’s affidavit does not reveal his understanding of whether Weiss’s MFN clause altered the effect of the MFN Draft which he first proposed.
The final document submitted in support of defendants’ motions for summary judgment was the deposition of Weiss. Weiss confirmed that the Hoovers contacted him about the Lease in May 2008. Weiss reviewed Pou’s Letter Agreement and edited the MFN Draft. He did not recall if he ^discussed his addition of the words “successors” and “assigns” with Pou. Weiss believed that his version of the MFN clause “was an improvement.” Weiss said that his reason for making changes to Pou’s clause was as follows:
I think, to make it clear, that the most-favored nations clause would apply to the successor and assign, Goodrich, to make sure that if Goodrich transferred the right in the lease, that the Hoovers would have the same most-favored nations clause and to prevent Petróleo or Goodrich from taking this lease in one name and going out and taking leases in another or joining up with someone to do that. So I was trying to broaden it and to make it do what I understood to be the party’s intent, which was if during the term of this thing someone got a higher bonus or higher royalty, that the Hoovers would benefit from that.
Weiss explained that the basis of his understanding of the parties’ intent came from his “discussions with my clients, my review of the documents and the very brief conversation I would have had with Jeff Pou.”
After receiving arguments on the parties’ motions for summary judgment, the court granted Hoover’s summary judgment, finding that the Transfer was an assignment sufficient to allow application of the MFN clause by virtue of Chesapeake’s subsequent actions in acquiring the third party leases. The court therefore denied the cross-motion for summary judgment by Goodrich. The trial court also ruled that the royalty for the Hoover Lease was increased to 30%. Finally, the court granted Chesapeake’s summary judgment after determining that Goodrich was the sole party responsible for the higher bonus under the terms of the MFN clause. Both Hoover and Goodrich have appealed raising the same arguments urged in support of and opposition to the summary judgment motions. Hoover also appealed seeking to hold Chesapeake liable with ^Goodrich for the $7.6 million judgment. Neither of the appealing parties assert or have identified material issues of fact that require the reversal of the trial court’s summary judgment rulings.

*165
Discussion

I.
Hoover’s appeal presents, as its sole assignment of error, the issue of whether Chesapeake is obligated with Goodrich to satisfy the higher bonus-related payment under the MFN clause. The trial court ruled that only Goodrich was obligated for the $7.6 million bonus-related payment. While we recognize that this issue on appeal appears secondary to the primary issue regarding the interpretation of the MFN clause, we choose to address it first. The responsibility of the leasehold ownership for the obligations of a mineral lease as provided in the Mineral Code (La. R.S. Title 31), enacted in 1974, is important for the interpretation of the meaning and application of the MFN clause.
Louisiana mineral leases typically contain numerous and extensive provisions resulting from the negotiations of the parties. The Mineral Code shows that those provisions create duties and obligations which differ from merely personal obligations. Article 16 of the Mineral Code provides that the mineral lease is one of the “basic mineral rights.” La. R.S. 31:16. “Mineral rights are real rights.” Id. A mineral right is an incorporeal immovable. La. R.S. 31:18.
Under Civil Code Article 476, the real right is identified as one of the various rights in things and is discussed in the Revision Comments to that | inarticle. Comment (b) states:
Real rights confer direct and immediate authority over a thing. They are distinguished from personal (obligatory) rights that confer merely authority over the person of a certain debtor who has assumed the obligation to allow the enjoyment of a thing by his creditor.
Additionally, Comment (d) to Article 476 discusses Louisiana’s allowance for the creation of real rights by parties through their contracts, as follows:
[T]he Louisiana Supreme Court adopted the view that, in principle, the parties to a contract may create real rights “apart and beyond” those created in the Civil Code, subject to close judicial scrutiny in the general interest of the public. However, little use of this facility has been made in practice. The most important examples of real rights created by the exercise of contractual freedom in Louisiana are the mineral rights, now regulated by the Mineral Code, and building restrictions in subdivision developments. For detailed discussion, see Yiannopoulos, Real Rights: Limits of Contractual and Testamentary Freedom, 30 La.L.Rev. 44 (1969).
For example, regarding building restrictions which are real rights addressed in the Civil Code (La. C.C. arts. 775, et seq.), the revised statutes make clear that building restrictions may include the imposition of “the affirmative duty to pay monthly or periodic dues or fees” to a homeowners association. La. R.S. 9:1141.5(B). Such monetary obligation is incidental to the real right embodied in the building restrictions. See, Louisiana Bureau of Credit Control, Inc. v. Landeche, 08-1099 (La.App. 3d Cir.3/4/09), 6 So.3d 935, and Tall Timbers Owners' Ass’n v. Merritt, 376 So.2d 586 (La.App. 4th Cir.1979). Likewise, under Article 114 of the Mineral Code,[9] the parties’ contractual freedom for the creation of the mineral lease as a real right allows for the imposition of monetary obligations that arise launder the terms of *166 the Lease upon various events and that then may become owed by the leasehold owners.
As the result of Mineral Code Articles 16, 18 and 114, as discussed in their official Comments, the pre-Code conflict in the jurisprudence “over whether the interest of the lessee under a mineral lease is a real right or merely a personal contract” was “laid to rest by classification of the interest as a real right.” La. R.S. 31:16, 18 and 114, Comments for Articles 18 and 114 quoted. Thus, obligations of the lessee that are created in a mineral lease are real obligations and not merely personal. Civil Code Article 1763 defines a real obligation as a duty correlative and incidental to a real right.
With this foundational principle establishing the mineral lease as a real right, the Mineral Code in Article 128 then addresses the transfer of lease rights and the responsibility of subsequent owners of the leasehold for the obligations of the lease, as follows:
To the extent of the interest acquired, an assignee or sublessee acquires the rights and powers of the lessee and becomes responsible directly to the original lessor for performance of the lessee’s obligations.
La. R.S. 31:128. Article 128, therefore, first provides that the assignee or subles-see acquires the rights and powers of the lessee. Those rights and powers may be less than all of the rights of the original lessee.[10] Nevertheless, “to the extent of the interest” conveyed by a partial assignment or sublease, the rights and powers carved out of the leasehold interest are themselves real rights. Article 128 next recognizes that parties |12who were not in privity with the lessor nevertheless become obligated directly to the lessor for the lease obligations. This is in keeping with the nature of the mineral lease as a real right and the real obligations thereby created.
In its appellate brief, Chesapeake agrees with Goodrich’s interpretation of the MFN clause regarding the application of the distinction between the assignment and sublease of a Louisiana mineral lease. From that issue, which will be reviewed below, Chesapeake asserts that it was the sublessee of Goodrich by virtue of the Transfer affecting the Hoover Lease. Nevertheless, Chesapeake argues that despite its status as a sublessee, the Lease language expressly makes the MFN obligations the personal obligations of Goodrich alone, thus negating the principle of Article 128. We disagree.
Initially, we note an inconsistency in the trial court’s interpretation of the obligatory force of the MFN clause. On the one hand, the judgment applies the MFN clause to require the higher bonus-related payment by Goodrich alone. On the other, the judgment applies the clause to increase the lease royalty obligation to 30%, making the higher royalty applicable to Goodrich and Chesapeake alike for their co-ownership of the deeper rights and the Haynes-ville zone. Nevertheless, the higher bonus and royalty obligations of the MFN clause when considered under the Mineral Code are indistinguishable as real obligations incidental to the real right and owed by all owners of the incorporeal immovable according to Article 128.
We reject therefore any contention that the MFN clause imposes only 11sa personal obligation upon Goodrich as a matter of *167 contract and that Chesapeake would have had to assume Goodrich’s personal obligations regarding the higher royalty and bonus-related payment. Goodrich, despite the initial participation of Petróleo, is clearly acknowledged within the Lease as the original lessee. If the MFN clause had named only Goodrich throughout its provisions without reference to “assigns” or any other party that might thereafter acquire a leasehold interest, the operation of that clause by Goodrich’s act of acquiring a third party lease with a higher bonus and royalty would cause the real obligations of that provision to be binding on any existing co-owner of the incorporeal immovable/leasehold with Goodrich under the principles governing real rights as embodied in Article 128. Goodrich and Chesapeake co-owned the operational rights for the Haynesville zone at the time of the acquisition of the third party leases which are now asserted to have triggered the bonus-related payment and the increased royalty. Article 128 recognizes the performance of the higher royalty and bonus payment obligations as the responsibility of Chesapeake because of its acquisition of ownership in the Lease.[11]
II.
The principal assertion of Goodrich in this appeal, with which Chesapeake agrees, is that the Transfer which the corporate entities executed was a sublease, despite the transaction’s label as an assignment. Therefore, since the MFN clause addresses only third party leases acquired 1 uby Goodrich and its “successors and assigns,” Goodrich argues that the clause did not operate when its sublessee acquired the third party leases. In support of this position, Goodrich cites Louisiana jurisprudence dealing with interests created and conveyed out of the mineral lessee’s interest in a mineral lease. The legal effect of certain transfers of a mineral lessee’s interest has been viewed as a sublease of the mineral lease.
Disputing Goodrich’s argument, Hoover places emphasis on the entire phrase “successors and assigns,” insisting that “Chesapeake is a successor or assign of Goodrich regardless of whether the [Transfer] is considered a sublease.” Hoover cites the Civil Code’s definitions for “Successor” and “Assigns” in Article 3506(5) and (28). La. C.C. art. 3506(5) and (28).
The interpretation of a contract typically presents a question of law that may be resolved by summary judgment. Stephenson v. Petrohawk Properties, L.P., 45,296 (La.App.2d Cir.6/2/10), 37 So.3d 1145; Total Minatome Corp. v. Union Texas Products Corp., 33,433 (La.App.2d Cir.8/23/00), 766 So.2d 685. Like contracts in general, a mineral lease is the law between the parties and regulates their respective rights and obligations. La. R.S. 31:114; Stephenson v. Petrohawk, supra; Winnon v. Davis, 32,988 (La.App.2d Cir.5/15/00), 759 So.2d 321. The general rules of contract interpretation apply when interpreting contracts involving mineral rights. Stephenson v. Petrohawk, supra; Blanchard v. Pan-OK Production Co. Inc., 32,764 (La.App.2d Cir.4/5/00), 755 So.2d 376, unit denied, 00-1297 (La.6/23/00), 765 So.2d 1043.
| ifiThe purpose of contract interpretation is to determine the common intent of the parties. La. C.C. art. 2045; Stephenson v. Petrohawk, supra; Rogers v. Horseshoe Entertainment, 32,800 (La.App.2d Cir.8/1/00), 766 So.2d 595, writs denied, *168 00-2894 (La.12/8/00), 776 So.2d 463, 00-2905 (La.12/8/00), 776 So.2d 464. The words used in a contract are to be given their generally prevailing meaning unless they are words of art or have acquired a technical meaning. La. C.C. art. 2047. When the words of a contract are clear, explicit, and lead to no absurd consequences, then no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046. When the words of a contract are susceptible of different meanings, they must be interpreted as having the meaning that best conforms to the object of the contract. La. C.C. art. 2048. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050. When the parties make no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose. La. C.C. art. 2054.
In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. La. C.C. art. 2056. Finally, if doubt arises that cannot be otherwise resolved, a contract must be interpreted against the obligee and in favor of the obligor of a particular obligation. Yet, if doubt arises from lack of a necessary | ^explanation that one party should have given, or the negligence or fault of one party, the contract must be interpreted in a manner favorable to the other party whether obligee or obligor. La. C.C. art. 2057.
 The determination of whether a contract is clear or ambiguous is a matter of law. Stephenson v. Petrohawk, supra; Town of Haynesville, Inc. v. Entergy Corp., 42,019 (La.App.2d Cir.5/2/07), 956 So.2d 192, writ denied, 07-1172 (La.9/21/07), 964 So.2d 334. Ambiguity exists as to the parties’ intent when the contract lacks a provision on the issue or when the language of the contract is uncertain or fairly susceptible to more than one interpretation. Rogers v. Horseshoe Entertainment, supra; Blanchard v. Pan-OK Production Co. Inc., supra; Noel v. Discus Oil Corp., 30,561 (La.App.2d Cir.5/13/98), 714 So.2d 105.
The terms which are at the center of this dispute — successor, assigns and sublessee (sublease) — are legal terms which the contracting parties used in or omitted from the MFN clause. “Successor” and “assigns” have specific definitions in the Civil Code. La. C.C. art. 3506(5) and (28). The concept of sublease, as identified in the Civil Code in the provisions for leases (La. C.C. arts. 2668, et seq.) and as developed specifically in the pre-Mineral Code jurisprudence for oil and gas leases, lacks a specific codal definition in both the Civil Code and the Mineral Code. The prevailing meaning for these legal terms will be considered by review of their sources in the law.[12] Whether variances in the meaning of these legal terms create *169 117ambiguity for the determination of the parties’ common intent for the MFN clause or whether the terms mandate the Goodrich/Chesapeake view or Hoover’s understanding of the clause are the questions presented.

The Lease Provisions and Terms of the Transfer

Initially, a review of the Lease in its overall context shows that the terminology dealing with assignments and successors was employed in other provisions in the Lease. For example, the contractual pooling clause in paragraph 7 of the printed Bath Form portion of the Lease provides that the provisions of that clause “shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, representatives, successors and assigns.” Paragraph 10 of the printed form then provides, in pertinent part, as follows:
The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, ... An assignment of the lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder to Lessor and, if Lessee or assignee of part or parts hereof shall fail to comply with any other provisions of the lease, such default shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee shall comply with the provisions of the lease.
Additionally, special added provisions were included in the Lease as “Exhibit A,” which is expressly stated to govern over the provisions of the printed form and to “be binding upon the parties hereto, and their respective heirs, representatives and assigns.” The MFN clause is enumerated in these special provisions as paragraph 30. Also, of importance, the above quoted 118provision of paragraph 10, relieving the original lessee of liability for the lease obligations, is overridden as follows in paragraph 27:
Goodrich Petroleum Company, L.L.C. shall be deemed to be an original “Lessee” under this Lease for all purposes affecting Lessor. Goodrich Petroleum Company, L.L.C. joins herein for the purpose of acknowledging the foregoing. The rights of the Lessee hereunder may be further assigned in whole or in part without the prior written consent of Lessor, but Lessee agrees to provide Lessor with a copy of any such assignment promptly. Notwithstanding any provision of this Lease to the contrary, including particularly paragraph 10, any assignment by the Lessee, including the initial assignment to Goodrich Petroleum Company, L.L.C. shall not relieve the Lessee hereunder of any duties, liabilities, or obligations owed to Lessor.
In these other provisions of the Lease, the terms “successors and assigns,” or simply “assigns,” were regularly employed without reference in those provisions to the transfer of leasehold rights to “subles-sees.” In fact, from our review, the entire Lease never uses the words, sublessee or sublease. Nevertheless, the Mineral Code’s affirmative expression in Article 127 of the lessee’s right to sublease his interests in the mineral lease is the supple-tive law governing the Lease, allowing Goodrich the right to sublease. La. R.S. 31:127.[13]
*170 We also find significant the discussion in paragraph 10 of the lessee’s right to make assignments and partial assignments affecting the Lease. The provision first addresses assignments broadly, granting the power to convey “rights” “in whole or in part.” Upon such assignment, the rights and obligations of the original lessee under the Lease shall extend to the “successors and assigns” who acquired those lease rights. Next, paragraph 10 specifically addresses the issue of a lease default by an “assignee of part 119or parts hereof.” The provision makes clear that such default of a leasehold owner who owns “a part of said lands,” whether the original “Lessee or any assignee,” shall not affect the lease coverage for the other lands owned by another leasehold owner. Therefore, the specific assignment of rights which this default provision addresses concerns the assignment to another of all rights of the lessee in a particular geographical area of the Lease. Similar lease provisions, as will be discussed in detail below, have caused litigation over the question of the division of a single mineral lease effectively into two leases, one for each separate geographical part of the lease premises as segmented by such assignment. From that jurisprudence, beginning with the early decision in Smith v. Sun Oil Co., 165 La. 907, 116 So. 379 (1928) (hereinafter “Sun Oil”), the question of whether a particular leasehold transfer is an assignment or a sublease has been repeatedly addressed.
Our review of the Transfer also reveals that the defendants repeatedly used the phrase “successors and assigns” in their transaction. Substantively, the Transfer conveyed an undivided 50% interest of the ownership of the leasehold interest to all depths and formations lying below the base of the Cotton Valley formation (hereinafter the “Deep Rights”). This was a transfer therefore of an operating or working interest as opposed to those non-operating interests discussed in the Mineral Code. See, e.g. Article 171 of the Mineral Code, La. R.S. 31:171. The operational rights to explore for and produce minerals from the surface to the base of the Cotton Valley remained exclusively with Goodrich. The rights for exploration and production of the Deep Rights became owned equally in indivisión between |j>nthe two companies. The Transfer, like a sale, was made for a stated price, and there was no overriding royalty interest retained by Goodrich to be paid out of the working interest revenue of Chesapeake attributable to its 50% ownership of the Deep Rights.

The Civil Code’s Definitions for Successor and Assigns

The term “successor” is defined in Article 3506(28) of the Civil Code, as follows:
Successor — Successor is, generally speaking, the person who takes the place of another.
There are in law two sorts of successors: the successor by universal title, such as the heir, the universal legatee, and the legatee by universal title; and the successor by particular title, such as the buyer, donee or legatee of particular things, the transferee.
The universal successor represents the person of the deceased, and succeeds to all his rights and charges.
The particular successor succeeds only to the rights appertaining to the thing which is sold, ceded or bequeathed to him.
La. C.C. art. 3506(28). From the general expression of the successor as a “person who takes the place of another,” we agree with Goodrich that Chesapeake did not take the place of Goodrich regarding all operational rights or obligations under the Lease, including the obligations of the MFN clause. However, the “successor by *171 particular title” as discussed in the article is identified as a “transferee” of rights that are “ceded” to such successor/transferee, Additionally, as recognized earlier in this opinion, Chesapeake as a transferee of rights in the Lease became an obligee with Goodrich for the obligations imposed by the MFN clause. In sum, we do not find that the term “successor” clearly resolves the issue. This lengthy |2i codal definition gives some support to both sides for their arguments of the issue presented. Therefore, since we do not find the term decisive for determining Chesapeake’s status for the operation of the MFN clause, we will move to the consideration of the second term, “assigns,” for resolution of this case.
Article 3506(5) of the Civil Code sets forth the following definition for “assigns”:
Assigns means those to whom rights have been transmitted by particular title; such as sale, donation, legacy, transfer or cession.
La. C.C. art. 3506(5). First, the illustrative listing in this definition is revealing in that there is no specific mention of an act of assignment of rights. At first blush, it might be expected that assigns do not include donees. Yet, a transfer by donation is within the scope of this definition. Likewise, a legatee who receives a transmission of rights by testament might not generally be thought of as within the group of recipients of rights defined as “assigns.”
The breadth of the category of these illustrated transactions results from the broad statement in the definition regarding the transmission of rights by particular title. Discussing this in his treatise, Professor Yiannopoulos states: “All inter vi-vos transfers of patrimonial assets are, in principle, transfers by particular title.” Section 8 of A.N. Yiannopoulos, Property § 195, in 2 Louisiana Civil Law Treatise (4th ed.2001), citing the definition of assigns in La. C.C. art. 3506(5). Additionally, there is no distinction in the definition for the transmission of rights for the ownership or co-ownership of a thing. Thus, the Civil Code’s definition of assigns preferences a broad collection of transfers by particular title. The definition does not address merely an “assignee” as one to whom rights have been transmitted by an assignment. The category of assigns is much broader.
Next, in reviewing this definition of assigns, we have also considered the specific chapter of the Civil Code for the “Assignment of Rights” (La. C.C. arts. 2642, et seq.) which provides rules pertaining to the transfer of credits and other incorporeal rights generally.[14] The “assignment of rights” chapter is a separate chapter in our law of Sale which initially provides that “[a]ll things corporeal or incorporeal, susceptible of ownership, may be the object of a contract of sale.” La. C.C. art. 2448. Thus, in this case, the parties’ broad labeling of this transaction as an “Assignment” or even a sale[15] would be appropriate, whether or not the Transfer between Goodrich and Chesapeake resulted in a sublease. It involved a transfer for a set price of the rights in incorporeal immov-ables which were the numerous mineral leases of the transaction, including the Hoover Lease. The broader meaning for the assignment of rights supports an im *172 portant statement in the Sun Oil case, the ruling which first brought the concept of sublease into the analysis of mineral lease transactions, where the Supreme Court observed that “[e]very sublease is, in a sense, an assignment, but every assignment of a lease is not a sublease.” Sun Oil, 165 La. at 911, 116 So. 379. This was correct in the broad sense, because an assignment of incorporeal rights occurs when any | frights are carved out of the original lessee’s ownership of a mineral lease and transferred to another.
From this review of the Civil Code’s definition of “assigns” and the assignment of incorporeal rights generally, the meaning for the term, “assigns,” in the MFN clause describing the actions of Goodrich or its “assigns” in obtaining third party leases does appear to include Chesapeake as a transferee of leasehold rights in this case. By particular title, Chesapeake was transferred rights in the Lease and thus is an assign of Goodrich within the meaning of Article 3506(5). Nevertheless, since this was a mineral lease transaction, we must further examine the body of jurisprudence addressing the issue of the sublease of a mineral lease.

The Louisiana Jurisprudence for the Sublease of a Mineral Lease

The dispute in Sun Oil concerned whether a mineral lease was effectively divided into two leases by virtue of a transfer by the original lessee (Sun Oil Company) of leasehold rights in 20 acres. Sun Oil Company retained all rights in the remaining 180 acres, but since no drilling or production was occurring in the 180-acre portion after the primary term of the lease, the lessor sued to cancel the lease on that portion. Production was occurring on the 20 acres. The important terms of Sun Oil Company’s transfer of the leasehold rights, which, under the court’s ruling, was deemed a sublease, were:
(i) the transferee/sublessee received all the operational rights of the lease to the 20 acres;
(ii) Sun Oil Company retained the right to receive a one-eighth overriding royalty from any production from the 20 acres; and
1 ^(iii) certain conditional rights of reversion of the lease to Sun Oil Company were provided.
The court reached its ruling by first interpreting a specific contractual provision in the lease involving partial lease assignments, similar to paragraph 10 of the Hoover Lease. The court further discussed at great length common law concepts of sublease and the French commentary on the civilian concept of an “un-derlease” as then identified in Article 2725 of the 1870 Civil Code. The court stated:
[The] original lease contains a stipulation permitting a partial assignment, viz.:
All covenants and agreements herein between the parties shall extend to and be binding upon their heirs, executors, administrators, successors and assigns; and this lease may be assigned, in whole or in part, either as to any interest therein or any portion of the premises; in which last event, lessee shall be liable only for the royalties accruing from the acreage retained by him, and, in the exercise of his option to extend this lease, shall have the privilege of paying such proportion of the rentals under this lease as the acreage retained bears to the entire acreage covered by this lease, and the assignee of the lessee shall have corresponding rights and privileges with respect to said royalties and rentals as to the acreage so assigned.
The paragraph which we have quoted gave the original lessee the right to divide the lease into two or more leases, *173 by assigning the lease on any part or parts of the 200 acres of land; and, if the assignment to Elliott was in fact and in law an assignment only, and not a sublease, the production of oil by Au-trey, on the 20 acres of land, and the payment of royalties thereon, did not keep the original lease in force on the 180 acres retained under lease by the Sun Oil Company. Our opinion, however, is that the so-called assignment made by the Sun Company to Elliott was in fact and in law a sublease, and not merely an assignment, and, therefore, that the operations carried on by Autrey on the 20 acres subleased to Elliott inured to the benefit of the sublessor, and kept the lease in force on the whole 200 acres of land. The fact that the Sun Company, as sublessor, and Elliott, as subles-see, in their contract, used the words, “grant, convey, transfer and assign,” did not, of itself, make the contract an assignment merely, or deprive it of the character of a sublease; for there were several stipulations in the contract which made it, essentially, a sublease, and not merely an assignment. Every | ^sublease is, in a sense, an assignment, but every assignment of a lease is not a sublease.
Sun Oil, 165 La. at 913,116 So. 379.
At the time of this ruling before the Mineral Code, the court looked to the Civil Code principles on predial leases for the development of the understanding of a mineral lease.[16] One important point of emphasis repeated in the civil law commentary cited in Sun Oil is that the sublease may be considered as a new lease “ingrafted” upon another lease. Under that analytical view, the civilian lease of our Civil Code at the time of Sun Oil was a contract where three things were “absolutely necessary,” (1) the delivery of the use and enjoyment of a thing; (2) the rent; and (3) the parties’ consent. Articles 2669 and 2670 of the Civil Code of 1870, now La. C.C. art. 2668; see also, Revision Comments, La. C.C. art. 2668. Thus, Sun Oil Company’s transfer of leasehold rights to the 20-acre tract compared favorably to the “lease upon lease” concept for a sublease since the use and enjoyment or the right to explore and produce were delivered to its transferee/sublessee for a rent, or overriding royalty, measured in a percentage on the production value obtained on the 20 acres.
A few years after the Sun Oil case, the dispute in Roberson v. Pioneer Gas Co., 173 La. 313, 137 So. 46 (1931), also involved the application of aj^similar partial lease assignment provision in the mineral lease. Contrary to the outcome in Sun Oil, the court found that the Roberson lease was indeed divided by the effect of that lease provision which was triggered upon the assignment of all of the original lessee’s rights to a specific geographical portion of the lease premises. The 125-acre lease in Roberson was divided by a transfer of the entirety of the leasehold rights to a 40-acre portion. The court *174 determined' that the transfer was an assignment and not a sublease as in its prior ruling in Sun Oil, with the following explanation:
Our opinion, therefore, is that the transaction between the defendant and Pipes & Mack was merely an assignment of the lease on the 40 acres of land, and not a sublease. The reason for that is that the defendant thereby disposed absolutely of its interest in the lease on the 40 acres of land, and left no contractual relation whatever between the parties, or obligation on the part of the assignee in favor of the assignor. * * * * The distinction between an assignment of a lease and a sublease is that, in an assignment, the assignor transfers his entire interest in the lease in so far as it affects the property on which the lease is assigned; whereas, in a sublease, the original lessee, or sublessor, retains an interest in the lease in so far as it affects the property subleased-by imposing some obligation upon the sublessee in favor of the sublessor, such as an obligation to pay additional rent to the sub-lessor. The reason why an obligation to pay an overriding royalty, or excess royalty, in a transfer of a lease, either in whole or in part, and even though the transaction be called an assignment or a sale of the lease, characterizes the transaction as a sublease, and not merely an assignment, is that, in oil and gas leases, under the settled jurisprudence of this state, the payment of a royalty is the payment of rent, and is not the payment of a price for the oil or gas rights, as if they were sold. [Citations omitted] (Emphasis in original)
Roberson v. Pioneer Gas Co., supra, 173 La. at 318-320, 137 So. 46.
Importantly, the assignment in Roberson of the original lessee’s entire rights in the 40-acre portion of the lease premises fit precisely within the specific contractual lease provision at issue in the Roberson lease. That provision addressed the effect of a partial default of the lease rental payment 12-during the primary term after the lease was “assigned as to part or as to parts of the above described lands.” The provision indicated that upon the original lessee’s transfer of all of the leasehold rights to a specific geographic area, the transferee would have the responsibility of paying the rental as to that acreage. Most importantly, from the perspective of the multiple leasehold owners after such transfer, the provision stated that the default in payment of rentals by one owner for his part of the lease premises would not cause the termination of the lease as to the other part or parts owned by other leasehold owners. While the contractual provision itself contemplated only a type of limited lease division upon the nonpayment of a portion of the lease rentals during the primary term, both Sun Oil and Roberson without explanation interpreted the clause broadly and by implication ruled that a lease containing such provision would be divided for all purposes into two leases upon the transfer of the entirety of the leasehold rights to a specific geographical portion. Such broad interpretation therefore moved the clause beyond merely the subject of rental payment default to effect a stringent modification of the typical ha-bendum clause[17] principle for maintenance of the entire lease beyond the primary term by the operations and production of one well.
*175 Thus, Sun Oil and Roberson should be seen more specifically as contractual interpretation cases addressing the specific meaning of the very similar partial assignment clauses contained in both leases. The latter case [^involved the transfer of all the leasehold rights in and to a specific portion of the lands or lease premises, and the contractual clause was held to divide the lease.[18]
In line with these rulings, the Louisiana Supreme Court and other appellate courts addressed similar lease division controversies on numerous occasions. Swope v. Holmes, 169 La. 17, 124 So. 131 (1929); Johnson v. Moody, 168 La. 799, 123 So. 330 (1929); Tyson v. Surf Oil Co., 195 La. 248, 196 So. 336 (1940); Bond v. Midstates Oil Corp., 219 La. 415, 53 So.2d 149 (1951); Noel Estate, Inc. v. Murray, 223 La. 387, 65 So.2d 886 (1953); Odom v. Union Producing Co., 129 So.2d 530 (La.App. 2d Cir.1961), aff'd, 243 La. 48, 141 So.2d 649 (1961). The type of partial lease assignment clause present in Sun Oil and Roberson was also apparently contained in the leases in these cases although the clause was not always quoted in each case.
Additionally, there are numerous other pre-Code cases addressing the sublease/assignment distinction which involve the issue of privity between the original lessor and leasehold owners. Broussard v. Hassie Hunt Trust, 231 La. 474, 91 So.2d 762 (1956); Berman v. Brown, 224 La. 619, 70 So.2d 433 (1953); Tomlinson v. Thurmon, 189 La. 959, 181 So. 458 (1938); Pepper v. Pyramid Oil & Gas Corp., 287 So.2d 620 (La.App. 3d Cir.1974); Scurlock Oil Co. v. Getty Oil Co., 278 So.2d 851 (La.App. 3d Cir.1973), rev’d in part, 294 So.2d 810 (La.1974); Iberian Oil Corp. v. Texas Crude Oil Co., 212 F.Supp. 941 (W.D. Louisiana 1963), aff'd, 328 F.2d 832 (5th Cir.1964).
Another case with unique facts concerning the transferred leasehold rights is Scurlock Oil Co. v. Getty Oil Co., supra. At the Third Circuit Court of Appeal, before review by the Louisiana Supreme Court, the case illustrates the difficulty surrounding the partial assignment/sublease determination which can become complicated by the wide-ranging variety of working interest conveyances used in mineral transactions. In Scurlock, the initial appellate ruling found that a sublease had occurred by the transfer of the lessee’s interest to a particular zone of production. Thus, the transferee in this leasehold transaction received only the rights in the depths or strata producing in a unit which unitized only a portion of the acreage of the lease. The transferor retained all leasehold rights in the acreage lying outside the unit and all the non-producing depths of the lease acreage lying inside the unit. Nevertheless, the transferor did not retain any overriding royalty for the producing unitized zone of production which was conveyed. Therefore, the transferee asserted that the transfer was an assignment, and with that assertion, the transferee argued that a release of the leases by the transferor did not terminate its leasehold rights in the producing unitized zone. The appellate court disagreed, finding that a sublease had occurred and that the sub-lessor, which was the only party with privity of contract with the lessor, had released all rights in the lease.[19]
*176 |,^Nevertheless, the Supreme Court did not affirm the Third Circuit’s finding of a sublease. Scurlock Oil Co. v. Getty Oil Co., 294 So.2d 810 (La.1974). The court effectively pretermitted the issue of partial assignment/sublease and found that, even assuming a sublease had occurred, the transferor’s release of the leases was narrow and only released its retained rights in the leases and not the rights which had been conveyed for the producing unitized zone.
All of the foregoing pre-Mineral Code jurisprudence beginning with Sun Oil made the distinction between an assignment and a sublease of the mineral lease with an eye toward the theory of the subleasing of predial leases, yet without any definition in the Civil Code for the meaning of an “underlease” of a predial lease.[20] Without a codal guide, there were controversies in the jurisprudence and an inconsistency in the theoretical emphasis of the “lease upon lease” concept for the sublease as first reflected in Sun Oil. When relaxed and broadened, the “lease upon lease” concept for the sublease became the “any retained interest” measure.
In this context, the redactors of the Mineral Code, in their official Comments, recognized that the jurisprudential issues raised by the distinction between an assignment and a sublease were “vexing problems” |s1that needed resolution. Comment, Article 127 of Mineral Code, La. R.S. 31:127. Nevertheless, the redactors chose not to alter the jurisprudentially developed analysis distinguishing assignments from subleases, but instead chose to make the consequences flowing from the execution of either an assignment or a sublease the same in most respects.[21] Id. Thus, while Articles 127 through 132 repeatedly acknowledge the mineral lessee’s power to partially assign or sublease the lease, the Mineral Code never defines the difference between the two transfers and their creation of interests out of the lessee’s interest in the mineral lease. All the *177 while, the redactors’ official Comment candidly cites two papers presented to the Institute on Mineral Law (now the Louisiana Mineral Law Institute), both of which are critical of the jurisprudential application of the concept of sublease for predial leases to Louisiana mineral leasehold transactions. Id., citing Scott, More on Assignment and Sublease, 12th Institute on Mineral Law 29 (1965); Tucker, Sublease and Assignment: Some of the Problems Resulting from the Distinction, 3rd Institute on Mineral Law 176 (1955). See also, Plauche, The Impact of the Louisiana Mineral Code on Oil, Gas and Mineral Leases, Part II — Sublease and Assignment, 22nd Institute on Mineral Law 107 (1975).
| a ¿Assignments of Undivided Interests and Co-Oumership of Leasehold Rights
None of the above cases which raise the issue of sublease involved the transfer of an undivided interest in a mineral lease. Our research nevertheless has identified cases by the Louisiana Supreme Court where such transfers occurred, and the court’s descriptions of the leasehold transactions and its rulings reveal that the transfer of an undivided interest in the leasehold has not been recognized as a sublease.
An important set of rulings by the Louisiana Supreme Court involved the Wier v. Grubb controversy, Wier v. Grubb, 215 La. 967, 41 So.2d 846 (1949), and Wier v. Grubb, 228 La. 254, 82 So.2d 1 (1955). The controversy concerned a mineral lease which was originally acquired by plaintiff, Wier. As the original lessee, Wier asserted the breach of the development obligation against three defendants who had acquired rights by sublease from Wier. The leasehold transactions to the three defendants, which were the central facts of the parties’ controversy adjudicated twice by our highest court, were described by the court as follows:
In October, 1940, petitioner subleased this acreage to defendant Grubb, reserving a 1/16th overriding royalty thereon. Grubb assigned a l/4th interest in the sublease to defendant Russell and a 3/8ths interest to the defendant Hawkins.
Wier v. Grubb, 41 So.2d at 847 (emphasis supplied). Since the original transaction from Wier delivered to Grubb the exclusive right to explore on part of the lease acreage with Wier’s retention of an overriding royalty, the “lease upon lease” test of Sun Oil was clearly met. There was no controversy that Grubb had acquired a sublease of the mineral lease, as opposed to a partial assignment. All three defendants were then recognized [⅞⅝⅛ relationship with Wier as sublessees, including Grubb’s two assignees of undivided interests in the sublease.
The first ruling of the court in 1949 reversed the trial court’s dismissal of the case which held that no cause of action existed to support the claim against the sublessees. The defendants’ argument that only the original lessor of the property could seek enforcement of the obligation of reasonable development was rejected by the supreme court. After the subsequent trial determined a breach of the defendants’ development obligation and canceled the defendants’ sublease, the supreme court affirmed in its second Wier ruling. The court’s ruling basically equated the implied obligation of reasonable development owed to the lessor of the mineral lease as the same obligation owed by the three defendants to the sublessor, Wier. “A sublessor, as in the case at bar, assumes all rights, interest, obligations, penalties, etc., enjoyed by and granted to the original lessor.” Id., 82 So.2d at 7.
*178 The most important case by the Louisiana Supreme Court for our consideration of the legal effect of the Transfer between Goodrich and Chesapeake is Jamison v. Superior Oil Co., 220 La. 923, 57 So.2d 896 (1952). In that case, the plaintiffsAessors had obtained in the trial court the cancellation of the 191-acre mineral lease except for 10 acres surrounding one producing well. The defendant, however, was the owner of only an undivided half interest in the lease, having received its ownership through a sequence of assignments originating from the primary lessee, Adams Louisiana Corporation. Agreeing with the defendant that the judgment must|S4be set aside for nonjoinder of the other co-owner of the lease, the court ruled:
It is our opinion, however, that, there is a necessary party defendant whom these plaintiffs have failed to named (sic) and cite, such party being the owner of an undivided one-half interest in the oil, gas and mineral lease herein sought to be canceled.... The other undivided one-half interest was assigned by the Adams Oil & Gas Company (formerly the Adams Louisiana Corporation) to H.N. Greis as Trustee for Deep Rock Oil Corporation, the present owner thereof. Neither this corporation nor its trustee has been made a party to this suite.
Id., 57 So.2d at 897 (emphasis supplied).
The Jamison case is the only Louisiana ruling we have found where the legal effect of a transfer by the original lessee of an undivided interest in a mineral lease was addressed. The court’s recognition of the missing and indispensable leasehold owner as an assignee of an undivided interest in the lease, and not a sublessee, must be juxtaposed to its ruling four years later in Broussard v. Hassie Hunt Trust, supra. In Broussard, the plaintiffs had likewise received a judgment for lease cancellation in the trial court against the defendant, which had acquired the operating rights for the lease premises through the execution of two subleases. The original lessee had first transferred the lease reserving an override, and its sublessee had in turn subleased the lease to defendant, reserving an additional override. The supreme court considered the defendant’s exception of no right of action, agreeing that there was no privity between the plaintiffsAessors and the distant sublessee. The judgment was set aside. Thus, while in Jamison the assignee of the undivided interest in the lease was an essential party for ladease cancellation by the lessor, the sublessee in Broussard was the wrong party for the same claim for lease cancellation.
The Wier and Jamison rulings therefore are the only cases involving the transfers of undivided shares in the working interest of mineral leases. Both Wier and Jami-son involved the transfer of undivided working interests for the entirety of the lease acreage and all depths covered by the disputed leases. These transfers of leasehold ownership in indivisión were clearly described and characterized by our highest court as assignments, and the results of the court’s rulings would have been completely different as shown by Broussard had the transfers of the undivided interests in these cases been given the legal effect of a sublease.[22]

*179
Even more significant than the Wier and Jamison rulings, however, we find that the relationship created by the conveyance of leasehold ownership in indivi-sión is one of co-ownership under Louisiana’s law as addressed in both the Civil Code and the Mineral Code. Accordingly, we cannot find that the Transfer from Goodrich to Chesapeake was a sublease, causing them also to be in a sublessor/sub-lessee relationship.

The Transfer states that it was a conveyance of “an undivided fifty percent (50%) of 8/8ths interest in and to” the Lease and “interests in rights to explore for and produce oil, gas or other minerals” relating to the Lease, “save and except” the formations and depths between the surface and the |3r,base of the Cotton Valley formation. The Transfer therefore conveyed an operating or working interest in the Deep Rights. Yet it was an “undivided” interest, with Goodrich retaining the other “undivided” interest in the Deep Rights. Regarding the drilling of formations comprising the Deep Rights, the Lease contained a significant surface use restriction limiting the right of drilling on the surface of the Hoover property. Nevertheless, the right to drill through Goodrich’s shallower zones from a location on the unrestricted part of the lease premises, though not expressly addressed in the Transfer, was implicitly warranted and would be a part of the co-owners’ mutual decision for the exploration of the Deep Rights.
The relationship between Goodrich and Chesapeake after the Transfer of the Deep Rights falls squarely within the Louisiana law of co-ownership. “Two or more persons may own the same thing in indivisión, each having an undivided share.” La. C.C. art. 480. While the “thing” in this instance is the Deep Rights portion of the Hoover Lease, those mineral lease rights for exploration and development can be employed for the Deep Rights independently from the operational rights in the zones retained in full ownership by Goodrich. The Mineral Code in Articles 127 and 128 sanctions the lessee’s ability and freedom of contract to segment the lease into partially assigned areas or subleased portions of the lease. La. R.S. 31:127 and 128. The new ownership of those segmented portions of the mineral lease may act separately for the exploration and development of that portion of the leasehold, and the mineral lessor must accept performance by an assignee of that portion of the leasehold ownership. La. R.S. 31:131. _JjjArticles 127 and 128, in conjunction with Article 168,[23] are also broad authority in our opinion for the lessee to create co-ownership of the entire lease by the assignment of an undivided interest in the entirety of the lease to another, as was recognized in Wier and Jamison pre-Code. The allowance for a transfer of the leasehold ownership “in part” under Article 127 is the codal power for a conveyance of an undivided interest to a portion of the leased premises or to a geological zone or zones of the lease. This authority in Article 127 for the partial conveyance of lease rights clearly allowed Goodrich the contractual freedom to create co-ownership of the Deep Rights of the Hoover Lease.
Notably, there is nothing in the Transfer that contractually regulates how the two co-owners’ exploration and development of the Deep Rights will be conducted. There is no specific reference in the Transfer to a joint operating agreement, designating one *180 of the two parties as an operator and providing a process for development proposals by the parties. Cfi, La. R.S. 31:216 and 217 concerning the recording of joint operating agreements. However, the Transfer was made subject to the parties’ “purchase and sale agreement” which presumably provided for them joint development of the many co-owned leases effected by the Transfer.
In the absence of such joint operating agreement, the following principles of the Civil Code and Mineral Code would govern the co-ownership relationship of Goodrich and Chesapeake:
|ssCivil Code Article 801: The use and management of the thing held in indivi-sión is determined by agreement of all the co-owners. La. C.C. art. 801.
Mineral Code Article 177: A co-owner of the lessee’s interest in a mineral lease may not independently conduct operations or, except as provided in this article and Article 171, deal with the interest without the consent of his co-owner. He may act to prevent waste, destruction, or termination of the lease and to protect the interest of all, but cannot impose upon his co-owner liability for any costs or expenses except out of production. In so acting he must act in good faith and must deal with the interest of the remaining owner or owners in the manner of a reasonably prudent lessee whose interest is not subject to co-ownership. La. R.S. 31:177.
Mineral Code Article 173: Co-owners of the lessee’s interest in a mineral lease may compel partition of their rights. La. R.S. 31:173.
These provisions for the regime of co-ownership stand in sharp contrast to a sublease relationship between the subles-sor and sublessee of a mineral lease. From the perspective of the “lease on lease” concept for a sublease, Goodrich did not lease the Deep Rights to Chesapeake and provide it the exclusive use and enjoyment of that portion of the Lease. Chesapeake owed no rent or overriding royalty to Goodrich for the rights acquired. Thus, in light of the theory of sublease of predial leases presented by the esteemed civilian commentary cited in Sun Oil, the Transfer bears no resemblance to a new lease in-grafted upon Goodrich’s ownership of the Hoover Lease. Additionally, the right of the sublessor to demand further development of the mineral lease by his sublessee, recognized in the Wier rulings, would not be present in the Goodrich/Chesapeake relationship. Both co-owners might become in default to Hoover for the failure to explore and develop the Deep Rights, but that would be their mutual default as co-_jowners.S9 Finally, in making itself an owner in indivisión with Chesapeake by the Transfer, Goodrich cannot be said to have retained a right of control over Chesapeake. Both co-owners became on equal footing for the use, control and development of the working interest rights in the deeper zones, requiring their mutual agreement. La. C.C. art. 801 and La. R.S. 31:177.
In summary, the Transfer between Goodrich and Chesapeake was not a sublease of the Hoover Lease. It was an assignment of an undivided interest in the incorporeal immovable, the Lease. Chesapeake was therefore an assignee of a working interest in the Deep Rights and a co-owner with Goodrich. Such assignment did not divide the Lease by virtue of the operation of any clause in the Lease. In accordance with Mineral Code Article 128 and paragraph 10 of the Lease, the partial assignment of the leasehold rights to Chesapeake made it responsible directly to the original lessor, Hoover, for performance of the lessee’s obligations, including the bonus-related payment and 30% royalty resulting from the MFN clause. In that ownership relationship with Goodrich which resulted from the June 6, 2008 as *181 signment, Chesapeake was an “assigns” of Goodrich within the clear language of the MFN clause and the broad legal meaning of the term as expressed in Civil Code Art. 3506(5). When Chesapeake later acted in obtaining the third party leases, the obligations of the MFN clause therefore arose. Accordingly, the trial court’s ruling which determined that the MFN clause was triggered requiring a 30% royalty for the Lease and a $7.6 million payment to Hoover is affirmed.[24]

\ ^Conclusion

For the foregoing reasons, the trial court’s grant of Hoover’s motion for summary judgment is amended to make Chesapeake Louisiana, LP, obligated in solido, with Goodrich Petroleum Company, L.L.C., for the sum of $7,608,000, together with legal interest thereon from date due until paid. As amended, the judgment is affirmed. The trial court’s grant of the motion for summary judgment in favor of Chesapeake Louisiana, LP, is reversed. Costs of appeal are assessed to defendants, Goodrich Petroleum Company, L.L.C., and Chesapeake Louisiana, LP.
JUDGMENT AMENDED; AS AMENDED, AFFIRMED IN PART AND REVERSED IN PART.

. Hoover is owned and operated by the Hoover family including family matriarch, Josephine Doll Hoover, her three sons, Charles, Andrew and Sidney, and four grandchildren. It was Dr. Andrew Hoover who ultimately negotiated the Lease.

. Goodrich owned the existing lease as the successor to Sendero and Caddo Resources, LP, the original lessees.

. This language is taken from Goodrich and Chesapeake’s Statement of Uncontested Facts in support of their cross-motions for summary judgment.

. The Lease initially lists Petróleo as the named “Lessee.” However, Paragraph 27 of the Lease provided that Goodrich was deemed to be the original lessee under the *162 lease as it was the intent of Petróleo to assign the Lease to Goodrich. On May 7, 2008, Petróleo assigned to Goodrich "all of Assign- or’s right, tide and interest” in and to the Lease.

. These were identified as Lease Number LA 9543959-000 covering lands in T18N, R15W and LA9540003-003 covering lands in T18N, R15W and were executed in July and August of 2008.

. Although Goodrich initially argued to this court that the record failed to provide the necessary support to clearly establish that Chesapeake "made the leases” which granted the higher royalty and lease bonus, it has now withdrawn the argument. This argument prompted Hoover to seek to supplement the appellate record with written discovery responses made by Chesapeake which allegedly established this fact. This court denied the motion six days before Goodrich withdrew the argument. Accordingly, we accept the uncontested fact that Chesapeake obtained these third party leases with higher bonus payments and royalties after its acquisition of rights in the Lease.

.Petroleo's dismissal from the suit by summary judgment has not been appealed.

. As discussed above, at trial, no party contested that these spreadsheets were insufficient proof of Chesapeake’s acquisition of these third party leases with higher lease bonuses and royalties. On appeal, Goodrich has also abandoned its initial argument regarding proof of the fact of the leases.

. Article 114 of the Mineral Code (La. R.S. 31:114), the definitional statute for the mineral lease, provides that ''[a] mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals.”

. Articles 126 and 127 of the Mineral Code recognize tire viability of interests "created out of the mineral lessee’s interest” by partial assignments and sublease. La. R.S. 31:126 and 127.

. Additionally, as quoted infra, paragraph 10 of the Lease addresses partial lease assignments and makes the lease "provisions” which would include the MFN obligations extend to Goodrich's "successors and assigns.”

. We disagree with Goodrich's assertion that the Civil Code’s definitions for "successor” and "assigns” apply "only to the interpretation of the defined terms as they are used in the Code.” Within the interpretive principle of La. C.C. art. 2047, a legal term can have a generally prevailing meaning within the law that the parties to the contract can mutually intend to employ for their contract. In fact, Goodrich’s primary argument is a technical legal argument concerning the jurispruden-tially developed meaning of a sublease transfer of a mineral lease for which Goodrich contends Weiss failed to provide in the MFN clause.

. La. R.S. 31:127 provides: The lessee's interest in a mineral lease may be assigned or subleased in whole or in part.

. Chapter 15 of Title VII of the Civil Code is the chapter for "Assignment of Rights” in the law of Sale, formerly entitled "Of the Assignment or Transfer of Credits and Other Incorporeal Rights” prior to the 1993 revision to the law of Sale.

. In oral argument, counsel for Chesapeake referred to the Transfer as a large "asset acquisition” involving numerous Haynesville Shale leases, and counsel for Hoover stated the price to be $170,000,000.

. Nevertheless, as observed in the very early ruling of the court in Rives v. Gulf Refining Co. of Louisiana, 133 La. 178, 62 So. 623, 624-625 (1913):
Gas and oil leases and contracts are a part by themselves. There is scarcely any comparison between them and the ordinary farm or house lease.... The law with reference to sales and leases found in the Code cannot be unreservedly applied to these contracts. Such contracts partake of the nature of both sale and lease, and they have features which are not applicable to either.
The introduction to the Mineral Code by the Louisiana State Law Institute states that the pre-Code mineral law "was a product of jurisprudential development principally by way of analogy” to the Civil Code provisions for predial servitudes and leases. La. R.S. Title 31, Introduction.

. The clause in a lease setting forth the duration of the lessee’s interest in the premises. 8 Williams & Meyers, Oil and Gas Law, Manual of Terms, p. 465 (2010); O’Neal v. JLH Enterprises, Inc., 37,432 (La.App.2d Cir. 12/1/03), 862 So.2d 1021; La. R.S. 31:115 and Comment.

. The Transfer in this case, creating ownership in indivisión, to the Deep Rights, is not such a transfer of leasehold rights in a specific geographic portion of the Lease, like the two transfers at issue in Sun Oil and Roberson. As such, the Transfer did not implicate the provision of paragraph 10 of the Lease, quoted supra, concerning partial lease default and a possible lease division.

. The rationale given for the Third Circuit’s ruling was the broad statement in Roberson *176 that "in a sublease, the original lessee, or sublessor, retains an interest in the lease insofar as it affects the property subleased.” This statement, which might be labeled as the "any retained interest” test, convinced the court that a sublease had occurred. In so ruling, the court also implicitly rejected the "lease upon lease” test for the measure of a sublease since the court found that a reservation of an override or other obligation analogous to rent was unnecessary to effect a sublease. The transferor/sublessor of the Scurlock leases had retained the non-producing zones and surface rights to explore those zones within the portions of the lease acreage subleased; therefore "any retained interest” was all that the court required for its determination of a sublease.

. We have likewise reviewed the Louisiana jurisprudence concerning disputes over the subleasing of predial leases. Various cases have considered whether the lessee transferred rights in the leasehold by sublease or assignment. See, e.g., Whitmeyer v. Poche, 49 So.2d 69 (La.App. 2d Cir.1950). Nevertheless, we have not uncovered a Louisiana decision where a tenant conveyed an undivided interest in his lease and became faced with the claim that a sublease had occurred.

. As discussed above, Article 128 generally resolved issues stemming from the lessor's lack of privity with subsequent owners of the lease or portions thereof who acquire by either assignment or sublease. Article 129 addresses the continuing responsibility of assignors and sublessors for future performance of lease obligations. La. R.S. 31:129. Article 130 states the rule, always acknowledged in the jurisprudence, that the mineral lease is indivisible. La. R.S. 31:130. It is only the jurisprudential interpretation of the particular partial assignment clauses in leases that have caused certain leases to be contractually divided. See, Comment, La. R.S. 31:130. Articles 131 and 132 also deal with specific matters between lessor and assignees/sublessees related to the privity problem and the prior view of the mineral lease as merely a personal contract. La. R.S. 31:131 and 132.

. Our above quote from the Supreme Court’s description of the two mineral lease conveyances in Wier, supra, may be the most telling judicial recognition for the distinction between a sublease and an assignment of undivided interest in the leasehold. With the issue of privity of title in a sublease setting clearly a part of the Wier dispute, the Supreme Court specifically characterized Wier’s transfer to Grubb as a sublease of the mineral lease, and in the next sentence described Grubb’s transfer of undivided interests in the *179 sublease to Russell and Hawkins as an assignment.

. La. R.S. 31:168 provides that, "Mineral rights are susceptible of ownership in indivi-sión.”

. In Chesapeake’s appellate brief, it argues alternatively that “even if the most favored nations clause was triggered, the contract between Chesapeake and Goodrich should be reformed.” Chesapeake's basis for the asserted reformation was that it did not intend to acquire an interest in any lease with the type of MFN clause obligations contained in the Lease. Since no incidental demand was made between the defendants, reformation was never placed at issue in the trial court and is not before us. In any event, the real obligations of the recorded Lease became Chesapeake's obligations by virtue of its acquisition of ownership in the Lease.